Michael OLIVER, Plaintiff-Respondent-Cross Appellant,

v.

HERITAGE MUTUAL INSURANCE COMPANY and John K. Hoffman, Defendants-Appellants, Cross Respondents.

Court of Appeals

*No. 92–2934. Submitted on briefs June 11, 1993.—Decided August 25, 1993.*

(Also reported in 505 N.W.2d 452.)

On behalf of the defendants-appellants-cross respondents, the cause was submitted on the briefs of *Arthur P. Simpson* of  *Simpson & Deardorff* of Milwaukee.

On behalf of the defendant-appellant-cross respondent, John K. Hoffman, the cause was submitted on the brief of *Timothy S. Knurr* of *Schoone, Fortune & Leuck, S.C.* of Racine

On behalf of the plaintiff-respondent-cross appellant, the cause was submitted on the briefs of *M. Angela Dentice* of *Hausmann-McNally, S.C.* of Milwaukee.

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J.   Although there are several important issues, we deem the main issue to be whether the trial court misused its discretion when it ordered that an African-American be placed in the jury array from the petit jury and later ordered that the same African-American be placed on the *voir dire* panel of prospective jurors even though he had not been randomly selected in either instance. We hold that although the trial court's action was only with the highest and purest motives, it violated sec. 756.096(2)(a), Stats., mandating random jury selection. We further hold, however, that no prejudice ensued, and we affirm on this issue. We also address other issues, affirming in part and reversing in part and remanding with directions.

This case concerns a personal injury action by Michael Oliver. He was driving his motorcycle when it collided with an automobile driven by John K. Hoffman. Hoffman's automobile insurer is Heritage Mutual Insurance Company. Oliver sued both Hoffman and Heritage. We will refer to the two defendants as Hoffman unless the issue solely involves Heritage.

It is significant, under the facts of this case, to note that Oliver is an African-American. It is also signifi-

cant to note that the trial began on May 19, 1992, just a short time after the first "Rodney King" trial.[1] Following are the facts pertinent to the jury selection issue.

Ninety-four persons were summoned to the Racine county courthouse on May 17, 1992 to serve in various jury trials taking place at the courthouse. These persons are known collectively as the "petit jury." *See* secs. 756.04-756.096, Stats. On that day, thirty people were selected by the clerk to provide the "array" for this case. We use the term "array" to describe those petit jurors who have been selected to go to a particular court from which a *voir dire* panel is picked. From the array, twenty-one people were to be picked for the *voir dire* panel. Each remaining member of the array would be "on reserve" to be randomly selected, on a one-for-one basis, to take the place of any *voir dire* juror who might be excused for cause.

None of the potential jurors in the array for Oliver's trial was African-American. Oliver objected on this basis and requested that the trial court place "some minority" persons in the array of thirty. Hoffman responded that there was no "authority" for the request and that if the court were to grant the request, it would discriminate against Hoffman. The trial court determined that absent a showing of a defective jury pool, there was nothing improper with the way the county obtained its jurors. It pointed out that a certain procedure for challenging juries on the basis of racial makeup had been promulgated in *Batson v. Kentucky*, 476 U.S. 79, 93-98 (1986), and that Oliver had not availed himself of this procedure.

---

[1] For a succinct synopsis of the much-publicized events surrounding the first Rodney King trial, *see Vineyard v. County of Murray, Georgia*, 990 F.2d 1207, 1214-15 & n.1 (11th Cir. 1993) (Godbold, J., dissenting).

However, the trial court noted that the acquittal of the police officers involved in the first Rodney King case had occurred less than three weeks before. It opined that, regardless of how one may feel about that verdict, the judicial system had taken on a "real negative impression with the citizenry across the country because, in part, there were no African Americans on the jury." To avoid the "appearance of impropriety," it decided to place the thirty people in the array back into the pool of ninety-four petit jurors, "reshuffle the deck randomly," and "see what comes down." The trial court reasoned that "it still brings in the . . . element of randomness but just gives another shake of the dice. . . ."

Another random selection of thirty people from the petit jury pool of ninety-four took place and, again, no African-Americans were on the array. The trial court stated that there were two African-Americans in the pool of ninety-four. The trial court then said that it had three options. First, it could proceed with the array as selected. Second, the parties could stipulate to adding the two African-Americans to the array. Third, it could order another random selection. Hoffman refused to stipulate to adding the two African-Americans and objected to the court doing anything other than proceeding with the array already selected. Oliver said that he would accept the stipulation option.

The trial court ruled that the clerk would use the jury array that was generated the second time. However, the clerk was further instructed:

> [T]o insert whatever African Americans may remain, may be remaining upstairs and to reduce the number of thirty by the same number of African Americans, which in . . . raw numbers may amount

6

to one because one juror—apparently there are only two that came in this morning and it's believed that one of the African Americans was . . . sent to felony court . . . so this would be whatever remaining jurors are . . . up there.

The trial court realized that its order was a "departure from randomness," but that it would help "to preserve the integrity of the system." Hoffman objected and asked for a mistrial, which was denied. In denying the motion, the trial court noted that the African-American population in Racine county was fifteen percent and that the pool of ninety-four jurors contained less than fifteen percent. The court noted that although this was not a "fatal problem," the addition of an African-American juror would avoid the "appearance of impropriety." The court further revealed that a committee of judges and lawyers was working on making revisions in the way Racine county selects its petit jury, but the committee's work was still in progress.

The prospective African-American juror was named James Ray. He was one of either thirty or thirty-one persons in the final jury array (the record is equivocal about this). From this array, twenty-one were picked for *voir dire*. Ray was not one of the twenty-one; he was a "reserve." Oliver noted his concern on the record, but posed no objection. The trial court responded that *voir dire* would proceed as is.

During *voir dire*, five people were excused for cause, but Ray was not randomly selected as one of the replacements. He remained a reserve. After the fifth prospective juror was excused, Oliver moved the court, outside the presence of the *voir dire* panel and its remaining reserves, for an order that Ray be "moved forward" to take the fifth excused juror's place. Hoffman vehemently objected. The trial court reasoned

7

that usually its jury array consisted of no more than twenty-seven or twenty-eight persons. This array had more than that. Had Ray been on a normal array, he would have already been picked to replace one of the excused jurors. Based on this logic, the trial court placed Ray on the *voir dire* panel. Hoffman moved for a mistrial on the basis that it was contrary to the principle of random selection of juries.

Hoffman's attorney then informed the court that he would like to question Ray in chambers because he believed that he represented Ray in a case in the early 1980's. The attorney speculated that he doubted Ray would have "good things" to say because of the outcome in that case. The trial court stated that it would "cross that bridge" later and determined that the initial questioning of Ray would take place in the courtroom. The "bridge" soon loomed and Ray was summoned to chambers. Under questioning from the court, Ray stated that he was a plaintiff in a personal injury action in the 1980's, but denied that Hoffman's attorney was his lawyer. However, he admitted that another lawyer in the attorney's former firm handled his case. The trial court also asked whether the fact that Hoffman's attorney knew about the prior case would affect Ray in any way. Ray denied that it would and said that he would be neutral. Hoffman did not seek to strike Ray for cause.

The peremptory strikes took place and Hoffman's attorney struck Ray. Oliver moved that the defense articulate a race-neutral explanation for striking Ray. Hoffman's attorney responded that he thought Ray was extremely unhappy about the settlement of his lawsuit despite the fact that it appeared to be a good settlement. Hoffman's attorney further indicated that Ray expressed great displeasure with him at that time.

8

Oliver did not respond to this explanation and the trial court ruled that it was a proper race-neutral reason for striking Ray.

The trial took place and the jury found Hoffman seventy-five percent negligent and Oliver twenty-five percent negligent. The total damages awarded were $176,800. Other facts will be recited as necessary.

## JURY SELECTION ISSUE

Chapter 756, Stats., concerns juries and details their selection. Section 756.001(1), Stats., proclaims that trial by jury is a *cherished* constitutional right. Section 756.001(2) mandates that "[a]ll persons selected for jury service shall be selected *at random* from a fair cross section of the population of the area served by the court." (Emphasis added.)

Jury lists may be put together either by the clerk of the circuit court or by jury commissioners appointed by the circuit court judges. Section 756.03(1), Stats. Regardless of which arrangement is used, jury lists must be put together according to the tenets of sec. 756.04, Stats. The list, when put together, constitutes the petit jury. The names of all persons on the list are placed on cards and put into a tumbler.[2]

At least once a year, and more often if necessary, a sufficient number of names are drawn from this tumbler to obtain those persons who are to be summoned for jury duty. Section 756.04(2), Stats. The people whose names are drawn become the regular panel and the reserve panel. It is from these summoned individu-

[2]According to sec. 756.096(2)(b), Stats., an automated system may be used to randomly select jurors instead of the tumbler system. Because the record does not indicate which system is used in Racine county, we will assume for the purposes of this opinion that a tumbler system was used.

als that the array for any given court is picked. Although the record in this case does not indicate, we presume that the ninety-four persons summoned for jury duty prior to the start of Oliver's jury trial were picked in accordance with these statutes and were part of the regular panel.

The statutes further provide that the clerk draw as many names "as are necessary to secure a jury." Section 756.096(2)(a), Stats. The number needed must be *at least* enough petit jurors to make up a *voir dire* panel. Sections 756.096(2) and 805.08(2), Stats., require that enough names be selected from a tumbler so that the minimum number of jurors remains after the exercise of all peremptory challenges. For a civil trial with a twelve-person jury and one additional juror, such as the case before us, that minimum number is twenty-one. We arrive at this number by adding twelve people needed for a jury pursuant to sec. 756.096(3)(b), six for peremptory challenges pursuant to sec. 805.08(3), one additional juror as allowed under sec. 805.08(2), and one additional peremptory per side pursuant to sec. 805.08(3). Therefore, twenty-one is the minimum number of jurors needed to make up the *voir dire* panel in this case.

Because the petit jurors on the *voir dire* panel may also be excused for cause, it stands to reason that more than the minimum number must be present in the courtroom to provide an adequate number of jurors. As a matter of common sense, these "reserves" are also "necessary to secure a jury." It follows that all persons summoned to the courtroom, those initially selected for *voir dire*, and those initially in reserve, be randomly selected according to sec. 756.096(2), Stats.

Therefore, when the trial court ordered the clerk to place Ray in its courtroom as one of the array, the

action was contrary to sec. 756.096(2)(a), Stats. This statute was violated again when the trial court ordered Ray to be placed on the *voir dire* panel although his name had not been drawn from the tumbler.

We recognize that the trial court had the highest motives in mind—the concern for the appearance of fairness in our justice system. Still, the ethos of our system is a jury picked at random. That much is codified in sec. 756.001(2), Stats. It is also apparent from our case law. In *State v. Bond,* 41 Wis. 2d 219, 227, 163 N.W.2d 601, 604 (1969), our supreme court wrote:

> The jury selection system contemplates the intervention of chance and requires that chance must freely operate on a truly representative cross section of the community's population. [A party] is not entitled to a perfectly apportioned representation on [the] jury of 12 but to only a fair jury from a panel selected without regard to race or other discriminatory factors.

Were we to allow what Hoffman refers to as judicial "salting" of the jury panel, the ideal of randomness would be obfuscated. If the trial court was concerned that the regular panel selected from petit jurors fell short of the community's racial and ethnic makeup, the remedy would have been to declare a mistrial and try again when the makeup was more representational.

Nonetheless, we find no prejudice to Hoffman. As it happens, Hoffman's attorney was immediately aware of the identity of the prospective African-American juror. The attorney knew this because he was either Ray's lawyer in a case which took place in the past or was associated with that case. After striking Ray by peremptory challenge, Hoffman's attorney was

11

asked to give a race-neutral reason for his strike. He told the court:

> As was indicated clearly on the record, Mr. Ray presented a claim for personal injury against the Campbell Soup Company that I handled in the early 1980's and he was extremely unhappy about the settlement, although it was quite a good settlement considering the facts of the case. At the conclusion of that meeting . . . he looked at me and said, "If that's the best you can do, you're a poor excuse for a lawyer and a poor excuse for a human being." I can quote it because I have not forgotten it.

That explanation was reason enough to keep Ray from sitting on the jury. Ray never sat in judgment on this case, so there is no prejudice from that standpoint. Moreover, Hoffman does not even claim that he was forced to use a peremptory challenge to strike Ray instead of a challenge for cause. Even had he made this claim, we would discount it. The above quoted explanation by Hoffman's attorney would also have been reason enough for Hoffman to move to strike for cause. This way, he would not have had to use a peremptory challenge. Yet, no motion to strike for cause was forthcoming.

We therefore conclude that Hoffman's peremptory challenge on the *voir dire* panel eliminated the error. The entire jury ultimately seated to hear this case was randomly selected as required by law.

Perhaps aware of this fact, Hoffman contends that the trial court's actions placed undue emphasis on race and thus prejudiced the ultimate jury panel. He argues that the jury was "well aware of the efforts to place black individuals on the panel by the court and Mr.

Oliver's counsel." He notes that Oliver's attorney asked many questions about racial prejudice during *voir dire*. He observes that Oliver's counsel made references to race during closing arguments. He asserts that the jury selection process served to emphasize the questions asked on *voir dire* and Oliver's closing argument. Hoffman concludes that the trial court's actions "created a trial based upon race and not the facts."

We do not agree. Oliver's objection to the initial array of thirty took place in chambers. There is no indication that the petit jurors were ever informed of the reason for picking a new array. The discussion ensuing after the second array was picked also took place outside the presence of any petit jurors. There is no indication that when Ray was placed in the second array, the petit jurors knew he was inserted rather than randomly selected. Oliver's request that the trial court place Ray on the *voir dire* jury was also outside the presence of the petit jury as was the trial court's decision to place Ray on the *voir dire* jury.

In sum, no prospective jurors were ever privy to the discussions between the court and counsel regarding jury selection. Further, there is no record supporting any inference that the jury knew of Ray's selection as being anything other than random. There is therefore nothing to support the argument that the jurors were "well aware of the efforts to place black individuals on the panel." We conclude that the trial court erred. We further conclude that Hoffman has not shown prejudice. We rule against Hoffman on this basis.

13

## NAMING THE EXPERT AFTER THE
## SCHEDULING ORDER

Hoffman next claims that the trial court should have prohibited the plaintiff's liability expert from testifying because the expert was not named in a timely fashion under the scheduling order, there was no showing of excusable neglect on Oliver's part, and the trial court did not give a cogent reason for allowing the amendment to the order. As to the latter argument, he cites *Schneller v. St. Mary's Hosp. Medical Center,* 155 Wis. 2d 365, 372, 455 N.W.2d 250, 254 (Ct. App. 1990), *aff'd,* 162 Wis. 2d 296, 470 N.W.2d 873 (1991), for the proposition that extensions for court-imposed witness deadlines shall not be granted unless the court finds the failure to act was the result of excusable neglect.

We agree that *Schneller* controls this case. In that case, we held that sec. 801.15(2), Stats., deals specifically with the extension of time periods and requires a showing of excusable neglect. *Schneller,* 155 Wis. 2d at 372-73, 455 N.W.2d at 254. We also held, however, that the decision of the trial court will not be disturbed unless a misuse of discretion is clearly shown. *Id.* at 374, 455 N.W.2d at 254. Because the exercise of discretion is so essential to the trial court's functioning, we generally look for reasons to sustain discretionary decisions. *Id.*

Here, the trial court held only that Oliver's explanation was reasonable.[3] While this reason is sparse, we look to the record and find Oliver's explanation in his affidavit. There he explains that the liability expert, an accident reconstruction authority, was unable to make a determination until he knew the point of impact. The

---

[3] Judge Emmanuel J. Vuvunas, the predecessor to Judge Barry in this case, amended the scheduling order.

14

point of impact could not be determined until Hoffman was deposed. Hoffman was unavailable to be deposed until after the deadline set forth in the scheduling order.

We do not know why Hoffman was unavailable to be deposed. Hoffman makes no suggestion that he was faultless in this regard. In light of the record before us, we conclude that the liability expert's opinion depended upon Hoffman's deposition. Until that was forthcoming, the expert could not give an opinion. Without an opinion, it would be fruitless to name the reconstruction authority as an expert. We hold that the trial court did not misuse its discretion in allowing the amendment.

## BANKRUPTCY ISSUE

During the pendency of this action, Oliver filed for bankruptcy, apparently because of his inability to pay his hospital and medical bills. Oliver listed the value of his personal injury claim to be $25,000. Subsequently, the trustee in bankruptcy discharged the claim from bankruptcy pursuant to sec. 815.18(3)(i)1c, Stats., which provides for a $25,000 exemption on personal injury claims.

Hoffman argues that Oliver is limited to the payment of $25,000 since the balance of the claim belongs to the trustee in bankruptcy, not Oliver. Although Hoffman does not define it as such, he seems to be asserting that Oliver is judicially estopped from claiming that his sole right to recovery is $25,000 in the bankruptcy proceeding, but is not so limited in the personal injury action.

However Hoffman defines the claim, we reject it. He has no standing to assert an interest of the trustee in bankruptcy, the supposed owner of any monetary award exceeding $25,000. A bankruptcy trustee has the right to pursue litigation regarding the bankruptcy estate. *See Simonson v. McInvaille,* 42 Wis. 2d 346, 351, 166 N.W.2d 155, 158 (1969) (trustee in bankruptcy is expressly vested with power to collect and reduce to money the property of the estate). Any question concerning who is entitled to the amount exceeding $25,000 is between the trustee in bankruptcy and Oliver. Hoffman has nothing to do with it.

## PREVERDICT INTEREST FROM THE DATE OF THE OFFER

Prior to trial, on February 7, 1990, Oliver filed an offer to settle for $25,000. This offer was not accepted within ten days of receipt, pursuant to sec. 807.01(3), Stats. Posttrial, Oliver moved for judgment on the verdict plus preverdict interest and double costs. As to the preverdict interest, sec. 807.01(4) provides in pertinent part:

> If there is an offer of settlement by a party under this section which is not accepted and the party recovers a judgment which is greater than or equal to the amount specified in the offer of settlement, the party is entitled to interest at the annual rate of 12% on the amount recovered from the date of the offer of settlement until the amount is paid.

Because Heritage, Hoffman's insurer, was ordered to pay its policy limit of $25,000, and because the amount equaled the offer of settlement, Oliver maintained that Heritage was responsible for preverdict interest on

16

that part of the judgment it owed. The trial court agreed.

Heritage objects to the award of statutory interest based on the terms of its insurance contract. The contract provides in pertinent part:

> As respects an insured person, we will pay, in addition to our limit of liability:
>
> . . . .
>
> 2. Interest on damages awarded in a suit we defend accruing after a judgment is entered and before we have paid, offered to pay, or deposited in court that portion of the judgment which is not more than our limit of liability.

By the terms of its policy, it is only responsible for interest accruing after judgment is entered.

Heritage concedes that the foregoing contract language is not applicable when there has been an offer of settlement by the plaintiff pursuant to sec. 807.01, Stats., which has been refused by the insurer. We wrote in *Knoche v. Wisconsin Mut. Ins. Co.*, 151 Wis. 2d 754, 760, 445 N.W.2d 740, 743 (Ct. App. 1989), that:

> The purpose of sec. 807.01, to encourage settlement of cases prior to trial, would be subverted if the liability insurer could, by contract, free itself from the application of secs. 807.01(3) and 807.01(4).

Heritage argues, however, that *Knoche* turned on the circumstances surrounding the insurer's refusal of the offer to settle. We wrote:

> It is plain that Wisconsin Mutual was not disposed to settle Knoche's claim for $95,000. It did not file an acceptance of the offer with the clerk of court as provided by sec. 807.01(3). It chose to litigate

> vigorously its insured's negligence. It lost. It would
> be contrary to the purpose of sec. 807.01 to allow it
> to escape the consequences of its choice.

*Id.* at 759, 445 N.W.2d at 743. Heritage contends that the facts in this case are much different than *Knoche*. Oliver filed the offer of settlement on February 7, 1990. At that time, liability was very much in doubt. A more complete statement of the facts of the accident is set forth in another reported case. *See Kreuser v. Heritage Mut. Ins. Co.*, 158 Wis. 2d 166, 168-69, 461 N.W.2d 806, 807 (Ct. App. 1990). Briefly, for our purposes however, Hoffman was moving to the right to pick up Nancy Kreuser who was standing on a corner. There was a large dump truck behind Hoffman as he began moving to the curb. Oliver, operating a motorcycle, moved around the truck on his right and hit the rear passenger side of Hoffman's car. Oliver claimed that Hoffman was guilty of improper lane change. Hoffman asserted that Oliver was speeding in excess of the thirty miles per hour speed limit and was negligent in his passing.

At the time of the offer of settlement, various witnesses described Oliver as having been speeding. Based upon these facts, Heritage declined the offer of settlement believing that the liability issue would be resolved in Hoffman's favor. Three days after the offer of settlement expired, Oliver named his accident reconstruction expert, who eventually testified in a deposition that Oliver was traveling between nineteen and twenty-four miles per hour at the time of the accident. After the deposition, Heritage tendered its policy limit of $25,000 on August 8, 1990, roughly six months after the offer of settlement was filed. Oliver repeatedly refused to accept the policy limit.

Heritage argues that Oliver filed an early offer of settlement before the investigation was completed. It

18

asserts that *Knoche* must be read so that the contract language will be set aside in favor of sec. 807.01(4), Stats., when the insurer chooses to try the case rather than settle, all facts being known. When additional facts become known and those facts substantially affect the insurer's risk exposure, the statute should not take precedence over the contract. Heritage argues that the spirit of the statute should govern here.

Oliver responds that we should apply *Knoche* strictly so that anytime an offer of settlement is tendered and refused, an insurer's contractual provision regarding postjudgment payment of interest is unenforceable. Alternatively, Oliver argues that Heritage had two years to accept several offers of settlement prior to the formal February 7, 1990 offer but dragged its feet. Oliver asserts that Heritage had a duty to investigate this incident and cannot rely on the late deposition by the expert to relieve it of this duty.

We rule in Heritage's favor. We do not read *Knoche* as an ironclad rule, but rather a general rule where the purpose is to promote the intent of sec. 807.01, Stats. The purpose of the statute is to promote settlements; sanctions are provided for those instances where a party opts to forge ahead with trial rather than settle and loses as much as or more than would have been the case if settled.

Here, our decision does not turn on the fact that Oliver filed the offer to settle before Heritage had completed its investigation. Indeed, the statute allows offers to settle as soon as the issues are joined. We think it is common knowledge that joinder of issues often takes place before all of the facts are known. Therefore, we choose not to decide this issue on the basis that Heritage did not have the benefit of the acci-

dent reconstruction expert's opinion at the time of Oliver's offer to settle.

However, Heritage did what it should do in a situation such as this one. When an insurer gets an offer to settle and declines the offer based upon the facts known at the time, and later receives facts which significantly alter the risk assessment of going to trial, then the insurer should file its own offer to settle. In this case, Heritage filed its own offer to settle for the policy limits of $25,000, under sec. 807.01(2), Stats., on June 30, 1991. This was almost one year before the jury trial. Oliver declined the offer. By doing so, it was Oliver, not Heritage, who was taking the chance of trial.

Under these circumstances, we hold that the contract language in the insurance policy should control over sec. 807.01, Stats.[4] The statute's purpose would not be fostered by reaching the same result that this court did in *Knoche* for the reason that it was Oliver, in the final analysis, who refused to settle with Heritage—not the other way around. We reverse and

---

[4] By this, we do not sanction the idea that insurers may refuse to accept offers to settle and let the case drag on until submitting its own offer to settle. If the insurer refuses the initial offer to settle, it must be for good reason. If it is claimed that the reason for the insurer's offer to settle is that new facts are now known which were unknown at the time of the plaintiff's offer, the insurer must be found not to have been negligent in investigating to get this information; and the new information must be material to the case and material to the insurer's change of mind regarding settlement. Section 807.01, Stats., implies a reasonableness standard to which insurers, plaintiffs and defendants must all adhere. *See generally White v. General Casualty Co.*, 118 Wis. 2d 433, 348 N.W.2d 614 (Ct. App. 1984).

remand with directions that interest against Heritage be computed only from the date of judgment.

## DOUBLE COSTS

For the same reasons, we also reverse the award of double costs. Double costs are awarded as a sanction when offers to settle are not accepted. Section 807.01(3), Stats. We will not saddle Heritage with the label of being the party who refused to settle under the facts here.

Alternatively, we reverse because the statute itself has different terminology regarding preverdict interest and double costs. Section 807.01(3), Stats., provides:

> If the offer of settlement is not accepted and the plaintiff recovers a more favorable judgment, the plaintiff shall recover double the amount of taxable costs.

Oliver did not recover a more favorable judgment than the offer of settlement against Heritage. The offer was for $25,000 and Heritage's exposure in the judgment amounted to $25,000. By the unambiguous language of the statute, double costs are not in order.

Oliver's response to this issue is also curious. He claims only that it would be "patently unfair" for him to bear the costs of Heritage's decision not to settle the case. As we earlier stated, it may have been Heritage's decision at the outset, but it was Oliver's decision to forge ahead to trial the second time an offer to settle was on the table. We do not think it is patently unfair to allow Oliver only his regular costs. Double costs under this statute is a punitive measure. *See Gorman v. Wausau Ins. Cos.*, 175 Wis. 2d 320, 329, 499 N.W.2d 245, 249 (Ct. App. 1993). There is no reason for puni-

tive measures here. We reverse the award of double costs and remand with directions that the judgment be recomputed providing only for regular costs.

## CROSS-APPEAL

The jury awarded Oliver the amount of his past medical and hospital expenses—$40,535.94. The trial court declined to assess these costs to the defendants because Oliver had earlier gained discharge of these bills in bankruptcy. The issues on cross-appeal concern this ruling.

There is no challenge to the reasonableness or necessity of the bills. The issue is whether Oliver's bankruptcy precludes his recovery of medical and hospital expenses incurred. Oliver argues that the discharge of these debts in bankruptcy has no relevance to the personal injury action for two reasons. First, Oliver cites *Wiegel v. Sentry Indem. Co.,* 94 Wis. 2d 172, 180, 287 N.W.2d 796, 800 (1980), which restates case law holding that when a debtor is discharged, the debt itself is not extinguished. Rather, the discharge acts as a personal defense to the bankrupt person against further action on the debts. Although Oliver's argument is difficult to follow, he appears to argue that because the debts still exist, he can recover them. Oliver claims that the fact that he does not have to pay the debts because they were discharged in bankruptcy may be used by him as a defense to a demand for payment, but it does not stop him from recognizing the debts for offensive purposes.

Second, Oliver asserts that this factual situation is but another facet of the collateral source rule. That rule applies to situations where a plaintiff recovers benefits from a third party who is in no way connected to the defendant. The theory behind the collateral source rule

is that this extra source of benefits will either inure to the plaintiff, who will recover twice (once from the tortfeasor and once from the third party) or will inure to the tortfeasor who will "walk away" from having to pay at all. Given the choice between who is going to have the windfall, Wisconsin courts have chosen the plaintiff. *See Thoreson v. Milwaukee & Suburban Transport Corp.,* 56 Wis. 2d 231, 243, 201 N.W.2d 745, 752 (1972).

Oliver argues that bankruptcy is like a third party benefit. While no third party is benefiting Oliver, Oliver is still freed from the obligation of paying a debt. Thus, a windfall has developed and all windfalls should be resolved in the plaintiff's favor, not the tortfeasor's—for the same reasons expressed in the more common line of collateral source cases.

We reject both arguments. First, as to the meaning of discharge explained in *Wiegel*, that definition must be read within the confines of the facts in that case. In *Wiegel*, the insured party declared bankruptcy, thus relieving it of liability for the debt. The insured party's bankruptcy, however, did not discharge the insurer from liability. *Wiegel* cannot be read for any broader proposition. Nor can it be read for the proposition that a bankrupt person can still use a debt for offensive purposes so as to recover that debt from a third party.

Second, the collateral source rule pertains to cases where a third party actually either pays or gratuitously provides benefits to the plaintiff. Here, no benefits have been rendered by a third party. We conclude that the collateral source rule is intended for instances where a "benefit" is bestowed by a "third party" and this third party benefit is what creates the windfall. The collateral source rule is not intended for situations where the plaintiff creates the windfall by his own act.

23

So, although the issue is one of first impression, we have no hesitancy in deciding against applying the public policy behind our collateral source rule to this case.

Moreover, Wisconsin law mandates that medical bills be "incurred" by a plaintiff in order to be the subject of compensation. *See* Wis J I—Civil 1750A. We agree with Heritage that since Oliver was relieved of his obligation to pay the bills, there was no debt which was "incurred" at the time of trial.

We further agree with Heritage that were we to hold for Oliver on this issue, we might encourage some plaintiffs to declare bankruptcy so that payment intended for medical care providers could be transferred to the plaintiff instead. Such a windfall is unlike those in mine-run collateral source cases because the third party either gratuitously or by contract is providing the benefit. Here, the medical care providers are not *providing* a windfall at all and certainly not by reason of any gratuity or contract. It would be poor public policy to encourage bankruptcies for this purpose. We do not insinuate that Oliver filed bankruptcy for this purpose. We simply conclude that holding to the contrary might encourage the filing of bankruptcies in the future. We affirm on the cross-appeal.

Costs are denied to both parties.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded with directions.