STATE of Wisconsin, Plaintiff-Respondent,

v.

Nathaniel A. LINDELL, Defendant-Appellant-
Petitioner.†

Supreme Court

*No. 99–2704–CR. Oral argument May 30, 2001.—Decided
July 11, 2001.*

2001 WI 108

(Also reported in 629 N.W.2d 223.)

†Motion for Reconsideration denied 9-21-01.

690

691

For the defendant-appellant-petitioner there were briefs by *Timothy J. Gaskell* and *Hanson & Gaskel,* Westby, and oral argument by *Timothy J. Gaskell.*

For the plaintiff-respondent the cause was argued by *Diane M. Welsh,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

An amicus curiae brief was filed by *Rhonda L. Lanford* and *Habush, Habush, Davis & Rottier, S.C.,* Madison, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals affirming a judgment of the circuit court for La Crosse County, John J. Perlich, Judge.[1] The defendant, Nathaniel A.

---

[1] *State v. Lindell,* 2000 WI App 180, 238 Wis. 2d 422, 617 N.W.2d 500.

Lindell, was convicted in a jury trial of first-degree intentional homicide, arson, and burglary.

¶ 2. After his conviction, Lindell moved the circuit court to vacate the judgment and grant him a new trial on grounds that (1) the circuit court failed to strike a prospective juror for cause, forcing him to use one of his peremptory strikes to remove the juror from the venire, and (2) he received ineffective assistance of counsel when his trial attorney failed to present certain impeachment evidence.

¶ 3. The circuit court denied the defendant's motion and Lindell appealed. The court of appeals affirmed. The court of appeals applied the analysis on juror bias recently developed in this court and ruled that the challenged juror was neither objectively nor subjectively biased. The court of appeals also ruled that the defendant was not prejudiced by any alleged ineffective assistance of counsel. We granted the defendant's petition for review.

¶ 4. In this case, we have considered three issues and reach the following conclusions: First, under the juror bias standards promulgated by this court, juror D.F. was objectively biased as a matter of law and should have been removed for cause. The circuit court erred when it failed to remove juror D.F. for cause.

¶ 5. Second, under the facts of this case, the circuit court's error did not affect the substantial rights of the defendant. Lindell used the first of seven peremptory strikes to remove the prospective juror who should have been struck for cause, and the juror did not participate in the trial. Because our decision to affirm Lindell's conviction is at odds with *State v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997), which would have required an automatic reversal in any situation where the defendant used a peremptory strike to remove a

prospective juror who should have been excused for cause, we overrule *Ramos* and announce a new standard to protect defendants.

¶ 6. Third, we conclude that the defendant was not prejudiced by any alleged deficient performance of trial counsel.

¶ 7. Accordingly, the decision of the court of appeals is affirmed.

## I. UNDERLYING FACTS

¶ 8. Donald Harmacek, a La Crosse resident in his mid–60s, was killed in his home on November 25, 1996. Nathaniel Lindell, the defendant in this case, was convicted by a jury of first-degree intentional homicide in violation of Wis. Stat. § 940.01(1) (1997–98)[2] for causing Harmacek's death. Lindell was also convicted of burglary in violation of Wis. Stat. § 943.10(1)(a) and (2)(d), and arson in violation of Wis. Stat. § 943.02(1)(a), for burglarizing and torching Harmacek's home as part of the incident that caused Harmacek's death. Lindell was convicted of all these charges as a party to the crime, pursuant to Wis. Stat. § 939.05(1).

¶ 9. In the early morning hours of November 25, 1996, three men went to Harmacek's home with the intention of committing a burglary. The three men were Nathaniel Lindell, 21, his brother Joshua Lindell, 19, and Marcus Mitchell, 26. The men traveled in Joshua Lindell's car with Mitchell as the driver. The Lindells wore dark clothing and all three men carried two-way radios.

---

[2] All statutory references are to the 1997–98 volumes unless noted otherwise.

¶ 10. Nathaniel Lindell had burglarized Harmacek's home in the past; Harmacek kept a large coin collection in his house.

¶ 11. When the men arrived at a point near Harmacek's residence, Mitchell remained with the vehicle. The Lindells entered the residence by duct-taping a basement window and breaking it with a miniature Louisville Slugger bat. While they were in the basement, the Lindells found a small amount of money, and then Joshua Lindell picked up a wrench at Nathaniel Lindell's direction.

¶ 12. The men proceeded upstairs to the main level of the home where they observed Harmacek apparently sleeping on the floor. When Harmacek moved, Joshua Lindell, who was walking ahead of his brother, "freaked and knocked him on the head with the wrench." After this blow, Joshua Lindell asked his brother what they should do. Nathaniel Lindell responded by hitting Harmacek with a small hammer, causing significant injury and gruesome results. According to testimony by an expert in bloodstain-pattern analysis, Harmacek received at least three blows to the head. Joshua Lindell testified that "blood squirted up" when his brother hit the victim. Later Nathaniel Lindell took Harmacek's wallet from a nearby table and the men took $90 from it. Both Lindells proceeded to search the house for valuables.

¶ 13. The Lindells found alcohol in the house and they spread it about the main level and the basement. Nathaniel Lindell then lit fires in the house. The two men crawled back out the window through which they entered and returned to Mitchell who was at the waiting car. Harmacek died as a result of the trauma to his head and the fire.

¶ 14. Joshua Lindell pleaded guilty to first-degree intentional homicide as a party to the crime. He did so in exchange for (1) the State recommending that the judge give him parole eligibility after 25 years imprisonment, and (2) the State dismissing the arson and burglary charges against him. Joshua Lindell testified in his brother's trial. Mitchell, meanwhile, was granted complete immunity in exchange for his testimony in the trial of Nathaniel Lindell.

## II. LITIGATION FACTS

¶ 15. Nathaniel Lindell was charged with homicide and other crimes on March 5, 1997. The circuit court conducted numerous motion hearings in the case throughout the latter half of 1997 and January 1998.

¶ 16. Harmacek's murder received significant news media attention in the La Crosse area. In fact, months before trial, the parties and the circuit court were concerned with issues relating to media publicity and the future venire, particularly when Joshua Lindell pleaded guilty, and the parties had a dispute over the extent of media coverage about the case and Joshua Lindell's guilty plea. Nathaniel Lindell moved the circuit court to issue a protective order to prevent discussion of the case with members of the news media, but the circuit court denied the motion.

¶ 17. In addition, when a mental examination was done to assess Nathaniel Lindell's competency, the media requested access to the report and it became the subject of two motions by the 'defendant. In both instances, the circuit court declined to keep the report under seal.

¶ 18. Nathaniel Lindell also moved the circuit court to allow individual voir dire of prospective jurors and to mail prospective jurors a lengthy questionnaire

before they arrived for jury service. Both of these motions related to the defendant's concerns over pretrial publicity. The circuit court allowed individual voir dire, but it apparently did not approve any of the questionnaires that the defendant proffered to the court.

¶ 19. The motions noted above were made in the last half of 1997. In January 1998, just weeks before trial, the defendant moved the circuit court for change of venue "because an impartial trial [could] not be had in La Crosse County." Counsel for Lindell argued that a fair trial could not take place in the county "because of the nature and the amount, the overwhelming amount, of pretrial publicity." The circuit court denied this motion.

¶ 20. On the morning of January 26, 1998, jury selection began in the State's case against Nathaniel Lindell. District Attorney Scott Horne represented the State and Assistant State Public Defenders Christine Clair and Keith Belzer represented the defendant. The circuit court noted that it would begin with a venire of 50 prospective jurors but that initially only 28 would be brought into the courtroom.

¶ 21. The clerk called the first 28 prospective jurors. Prospective juror D.F. was not among these 28. She became, however, the 30th prospective juror called when the circuit court excused several of the first 28 candidates for lack of availability and called in 4 additional prospective jurors.

¶ 22. The circuit court asked whether anyone in the venire had heard of the facts of the case. So many people raised their hand in response to this inquiry that the circuit court decided to ask who had *not* heard about the case. The court then asked the venire whether anyone had decided about the guilt or innocence of those accused in the case. The circuit court

excused one juror who had already made a decision as to the guilt of those accused. The court also engaged in colloquies with a number of other prospective jurors who indicated they might have an opinion about the guilt or innocence of Nathaniel Lindell, but the court did not excuse any more prospective jurors once the court made a determination that each person could be impartial. D.F. did not indicate that she had already made up her mind about the guilt or innocence of the accused.

¶ 23. The circuit court then allowed the parties to read their witness lists to the venire to examine the extent of any relationships between the venire and witnesses, attorneys, and the defendant. When the State read the name of Shirley Otto, a long-time companion of Harmacek, D.F. indicated that she knew Otto. The following exchange then occurred between the circuit judge and D.F.:

> The Court: Miss [F.], how do you know Shirley?
>
> Prospective Juror [D.F.]: I've known Shirley and Donny for about twenty years. Our place of business, Donny was our Pabst distributor.
>
> The Court: Okay. Was the relationship such that you would have difficulty —
>
> Prospective Juror [D.F.]: No.
>
> The Court: Okay.
>
> Prospective Juror [D.F.]: Close friends, just friends, you know, over the years.
>
> The Court: Okay. Can you judge the credibility of her the same way you judge the credibility of any other witnesses?
>
> Prospective Juror [D.F.]: Yeah.

The State proceeded to read the names of more of its potential witnesses aloud. After further questioning of the venire by the attorneys, the circuit court asked: "The alleged victim in this case is Mr. Donald Harmacek. Is anyone acquainted with, related to by blood or marriage, or had any business dealings with Mr. Harmacek?" The transcript of the voir dire does not indicate that D.F. or any prospective juror raised a hand in response to this question.

¶ 24. The circuit court then moved on to questioning the venire about their criminal histories, among other things. The court dismissed one juror for cause because she was being prosecuted by the district attorney's office.

¶ 25. The jury selection began at about 9:20 a.m. and at around 10:45 a.m. the circuit court gave the venire a break. Out of the presence of the jury, the first words on the record went as follows:

> Ms. Clair: I'm going to ask that Miss [F.], who knows both Mr. Harmacek and Miss Otto, be struck for cause. It's not that she just knows him casually, this was a business acquaintance. And because she knows both of them — she said that she didn't think it would bother her. I just, you know, somebody that got murdered, and you know that person's girlfriend, you're going to have an emotional, feeling about that, and I think it's very difficult.
>
> And if I ask more specific questions about it, and then she gets struck, it's like I'm trying not to — I don't want somebody that knows him.
>
> The Court: She has assured us she can fairly and impartially judge this case. As long as she makes that assurance, I don't think I can strike her for cause. You can ask her some questions and we'll play it by ear, but I won't strike her at this time.

703

Ms. Clair: If after I ask her some questions — I don't want to ask you directly when I'm asking, because I don't want it —

The Court: You can ask then, or I will strike her on my own if, in fact, I find that that's necessary.

The parties and the court recessed at this point.

¶ 26. When the voir dire continued after the recess, the circuit court dismissed a number of prospective jurors for cause: two people because they had strong feelings about the general credibility of witnesses who testify pursuant to an immunity agreement; one man because he had strong feelings about the incident in the case, which occurred in his neighborhood; one woman because she felt she could not be fair to the defendant because she treated crime victims in her work as a nurse.

¶ 27. Counsel for the defendant, Clair, questioned jurors after the State had asked many questions. When Clair came to prospective juror D.F., the following exchange occurred:

Ms. Clair: Okay. Now, you had stated before that you knew Mr. Harmacek and you know Miss Otto.

Prospective Juror [D.F.]: Um-hum.

Ms. Clair: Was that from working at [a local store] or previous employment?

Prospective Juror [D.F.]: The previous. My parents used to own and operate [a La Crosse bar/restaurant], and Donny was our distributor.

Ms. Clair: Okay. How much contact did you have with either him or Miss Otto?

Prospective Juror [D.F.]: None really with Shirley other than knowing her. Donny, you know, when he made our deliveries three times a week.

Ms. Clair: Other than when he would make deliveries, did you ever socialize with him or did your family?

Prospective Juror [D.F.]: My parents knew him real well.

Ms. Clair: Your parents did?

Prospective Juror [D.F.]: Yeah.

Ms. Clair: Did you and your family talk of — about what had happened after, after his death?

Prospective Juror [D.F.]: Yes.

Ms. Clair: And how was that?

Prospective Juror [D.F.]: Hard. We knew Donny for quite a few years.

Ms. Clair: Was it very difficult on your parents?

Prospective Juror [D.F.]: Yeah. I had the loss of my dad the year before this happened to Donny, so prior to that. It was hard, yes.

Ms. Clair: Okay. Knowing that you had known him, and that your parents knew him even more so, and that he was the victim on the charges in this case, how does that make you feel right now sitting on this jury?

Prospective Juror [D.F.]: Okay. I think I could — I think I could go along with it and make my, you know, decision.

Ms. Clair: Do you think that you could listen to the evidence and look at the case without being — having an emotional reaction because of your relationship and your family's relationship with him?

Prospective Juror [D.F.]: Yes, because I worked part-time for my parents other than working at [a

705

local store]. So I wasn't [sic] on a daily basis. I mean he'd come in for breakfast every morning, but I wasn't there every day. I worked like — I went to school and worked afternoons, so I would meet him like when he would bring the deliveries that afternoon. But as far as an everyday basis, no, I didn't deal with Donny every day.

Ms. Clair: So do you think that if you were chosen to be on the jury, you would be able to listen to all the evidence and make a fair determination?

Prospective Juror [D.F.]: Yes, I think I could.

Ms. Clair: Okay. Thank you. I really appreciate that.

Counsel for the defendant went on to ask many questions of the venire and counsel for the State followed up with additional questions.

¶ 28. Individual voir dire of the prospective jurors then began in the nearby jury room. When D.F. entered the jury room for individual voir dire, defense counsel Belzer questioned her:

Mr. Belzer: Obviously you have told us previously that you knew something about this case before getting here today?

Prospective Juror [D.F.]: Um-hum.

Mr. Belzer: Had you also seen information in the newspaper or television?

Prospective Juror [D.F.]: Just other than what we've been reading in the paper and the TV has had prior to, you know, when this happened.

Mr. Belzer: Do you receive the daily newspaper?

Prospective Juror [D.F.]: Um-hum.

Mr. Belzer: You have read all the articles about the case?

Prospective Juror [D.F.]: Um-hum. Well, I can't say all of them. When I get time to read the paper, I do, yeah.

Mr. Belzer: What do you recall hearing about Mr. Lindell, about Nathan Lindell?

Prospective Juror [D.F.]: Well, just what had happened that night. I mean Donny, Donny lived like about six blocks from us —

Mr. Belzer: Um-hum.

Prospective Juror [D.F.]: — in the neighborhood. . . .So other than what had happened that evening, other than what I've read in the paper, that's, you know.

Mr. Belzer: Okay. Do you remember specific things from the paper about Nathan?

Prospective Juror [D.F.]: No. Huh-uh.

Mr. Belzer: Okay.

Prospective Juror [D.F.]: Not pinpoint anything, you know.

Mr. Belzer: You have discussed this case based on media reports with your family I assume?

Prospective Juror [D.F.]: My mom. I live with my mom since I lost my dad, yes.

Mr. Belzer: Sure.

Prospective Juror [D.F.]: So we've talked about it, yeah. We've known Donny. He was our beer driver for 47 years my parents were in business, so —

Mr. Belzer: When you discussed it with your mom, did either of you offer an opinion about whether you thought —

707

Prospective Juror [D.F.]: No.

Mr. Belzer: — anybody was guilty in the case?

Prospective Juror [D.F.]: No, huh-uh.

Mr. Belzer: Okay. Have you discussed the case with Ms. Otto at all?

Prospective Juror [D.F.]: No. We run [sic] into her a couple weeks ago on the elevator, and that's the first we'd seen her since this happened other than the funeral home that night.

Mr. Belzer: Earlier when you were answering questions, clearly you were very emotional, and it seemed like you were about to start crying. Are you sure you feel okay about sitting on this jury?

Prospective Juror [D.F.]: I feel very confident. Like I say, I knew him, but as far as personal, I think my parents knew him more personal than I did.

Mr. Belzer: Okay. Thank you.

¶ 29. After the attorneys had questioned all the prospective jurors individually, the circuit court judge asked the parties if they were "[r]eady for strikes." Belzer immediately renewed Lindell's request that D.F. be removed from the venire for cause. He noted that during the initial questioning of D.F. earlier in the day, D.F. had to stop talking because she was going to cry. He also stressed D.F.'s familiarity with Harmacek, a man D.F. repeatedly referred to as "Donny." The circuit court judge replied that he did not notice D.F. "looking like she was ready to cry," that D.F.'s relationship with Harmacek was minimal, and that D.F. had "repeatedly" maintained she could be impartial. Thus, the circuit court denied the defendant's request to strike D.F. for cause.

708

¶ 30. The defendant struck D.F. from the panel with his first peremptory challenge and therefore D.F. did not sit on the jury. At trial, the jury found the defendant guilty of homicide, arson, and burglary. The circuit court judge sentenced Nathaniel Lindell to prison on all three sentences, most important of which was the sentence on the first-degree intentional homicide conviction: life in prison with parole eligibility after 50 years.

## III. LEGAL FRAMEWORK FOR JUROR AND VENIRE BIAS

¶ 31. Cases concerning juror bias present difficult legal questions for this court. This is another such case.

¶ 32. In 1997, this court decided *State v. Ramos*, 211 Wis. 2d 12. The main issue in *Ramos* was identical to the principal issue here: What is the appropriate remedy when a defendant uses one of his or her peremptory challenges to remove a prospective juror who should have been struck for cause? In *Ramos*, we "[held] that the use of a peremptory challenge to correct a trial court error is adequate grounds for reversal because it arbitrarily deprives the defendant of a statutorily granted right," even though the defendant is found guilty by a fair and impartial jury. 211 Wis. 2d at 24–25.

¶ 33. Since *Ramos*, we have confronted a number of cases relating to juror bias. *State v. Ferron*, 219 Wis. 2d 481, 579 N.W.2d 654 (1998); *State v. Delgado*, 223 Wis. 2d 270, 588 N.W.2d 1 (1999); *State v. Broomfield*, 223 Wis. 2d 465, 589 N.W.2d 225 (1999); *State v. Faucher*, 227 Wis. 2d 700, 596 N.W.2d 770 (1999); *State v. Kiernan*, 227 Wis. 2d 736, 596 N.W.2d 760 (1999); *State v. Erickson*, 227 Wis. 2d 758, 596 N.W.2d 749

(1999); *State v. Mendoza*, 227 Wis. 2d 838, 596 N.W.2d 736 (1999). In several of these cases, the principal issue involved the alleged bias of prospective jurors who never served. In these cases, the principal issue was not whether a defendant received a fair and impartial jury but whether the circuit court committed reversible error in jury selection by making an allegedly incorrect ruling on "cause."[3]

¶ 34. In analyzing these cases, we have recognized three types of bias in examining whether a prospective juror or juror is impartial. *Faucher*, 227 Wis. 2d at 716.

¶ 35. The first type of bias is "statutory bias." Wisconsin Stat. § 805.08(1) provides that a person meeting certain statutory criteria shall not be allowed to serve as a juror in a case regardless of his or her ability to be impartial. *Id.* at 717. This rule applies to a prospective juror who is "related by blood or marriage to any party or to any attorney appearing in the case, or has any financial interest in the case." Wis. Stat.

---

[3] It is important to note that the events at voir dire in this case, in January 1998, occurred after *State v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997), but before a number of other cases in which this court attempted to clarify this area of the law. *State v. Faucher*, 227 Wis. 2d 700, 596 N.W.2d 770 (1999); *State v. Kiernan*, 227 Wis. 2d 736, 596 N.W.2d 760 (1999); *State v. Erickson*, 227 Wis. 2d 758, 596 N.W.2d 749 (1999); *State v. Mendoza*, 227 Wis. 2d 838, 596 N.W.2d 736 (1999); *State v. Broomfield*, 223 Wis. 2d 465, 589 N.W.2d 225 (1999); *State v. Delgado*, 223 Wis. 2d 270, 588 N.W.2d 1 (1999); *State v. Ferron*, 219 Wis. 2d 481, 579 N.W.2d 654 (1998) (opinion released June 1998).

§ 805.08(1).[4] When a party alleges this type of bias, a question of law is presented and we review the decision by the circuit court de novo. *See Kiernan*, 227 Wis. 2d at 744. Prospective juror D.F. did not fit within any of the categories constituting statutory bias.

■

¶ 36. The second type of bias is "subjective bias." This type of bias "is revealed through the words and the demeanor of the prospective juror" and "refers to the prospective juror's state of mind." *Faucher*, 227 Wis. 2d at 717. "Discerning whether a juror exhibits this type of bias depends upon that juror's verbal responses to questions at voir dire, as well as that juror's demeanor in giving those responses." *Kiernan*, 227 Wis. 2d at 745. We recognize that the circuit court sits in the best position to judge this type of bias. *Id.* Thus, we will uphold the circuit court's factual finding that a prospective juror is or is not subjectively biased unless it is clearly erroneous. *Id.*

¶ 37. Subjective bias is not the primary type of bias at issue in this case; D.F. steadfastly maintained that she would be impartial and the circuit court believed her.

---

[4] The legislature added the word "adoption" to the 1999–2000 version of this statute, resulting in the statute reading: "by blood, marriage or adoption." 1999 Wis. Act 162.

The statute also addresses a prospective juror who "has expressed or formed any opinion, or is aware of any bias or prejudice in the case." Wis. Stat. § 805.08(1). However, this court has said that these prospective jurors should be analyzed under the "subjective bias" standard described below. *Faucher*, 227 Wis. 2d at 717.

¶ 38. The third type of bias is "objective bias." This is the type of bias central to this case.[5] The category of "objective bias" recognizes that in some cases bias can be detected "from the facts and circumstances surrounding the prospective juror's answers" even though he or she pledges impartiality. *Delgado*, 223 Wis. 2d at 283. Specifically:

> [T]he focus of the inquiry into "objective bias" is not upon the individual prospective juror's state of mind, but rather upon whether the reasonable person in the individual prospective juror's position could be impartial. When assessing whether a juror is objectively biased, a circuit court must consider the facts and circumstances surrounding the voir dire and the facts involved in the case. However, the emphasis of this assessment remains on the reasonable person in light of those facts and circumstances. . . .[W]hen a prospective juror is challenged on voir dire because there was some evidence demonstrating that the prospective juror had formed an opinion or prior knowledge,. . .whether the juror should be removed for cause turns on whether a reasonable person in the prospective juror's position could set aside the opinion or prior knowledge.

*Faucher*, 227 Wis. 2d at 718–19. The standard of review in objective bias cases is somewhat more intricate than for the other two types of bias.
██

¶ 39. Whether a juror is objectively biased is a mixed question of fact and law. *Id.* at 720. The circuit court's factual findings will be upheld unless they are

---

[5] Because we find that prospective juror D.F. was objectively biased, we need not consider whether she was subjectively biased.

clearly erroneous. *Id.* Whether those facts fulfill the legal standard of objective bias is a question of law. *Id.* In addition, as we further explained in *Faucher*:

> This court does not ordinarily defer to the circuit court's determination of a question of law. However, a circuit court's conclusion on objective bias is intertwined with factual findings supporting that conclusion. Therefore, it is appropriate that this court give weight to the circuit court's conclusion on that question.
>
> The circuit court is particularly well-positioned to make a determination of objective bias, and it has special competence in this area. It is intimately familiar with the voir dire proceeding, and is best situated to reflect upon the prospective juror's subjective state of mind which is relevant as well to the determination of objective bias. We therefore give weight to the court's conclusion that a prospective juror is or is not objectively biased. We will reverse its conclusion only if as a matter of law a reasonable judge could not have reached such a conclusion.

*Faucher*, 227 Wis. 2d at 720–21 (citations and parenthetical information omitted). This case requires that we employ this latter standard of review in evaluating the circuit court's decision not to strike D.F. from the jury.

¶ 40. We note in passing that this court has been very hesitant to find that a category of persons is per se biased. *State v. Louis*, 156 Wis. 2d 470, 479, 457 N.W.2d 484 (1990), *cited with approval in Mendoza*, 227 Wis. 2d at 851.

## IV. OBJECTIVE BIAS

¶ 41. Applying the standards above, we conclude that prospective juror D.F. was objectively biased and

should have been struck for cause. The totality of circumstances demonstrates that a reasonable person in D.F.'s position could not have remained fair and impartial.

¶ 42. Prospective juror D.F.'s familiarity with the victim plays a major role in our finding of objective bias, though it is not the only factor. *See Faucher*, 227 Wis. 2d at 735; *State v. Zurfluh*, 134 Wis. 2d 436, 438, 397 N.W.2d 154 (Ct. App. 1986). D.F. knew the victim for a long period of time—about 20 years—and her parents knew the victim for an even longer period of time—47 years. There was particularly strong indicia of objective bias when the juror said that she was "[c]lose friends, just friends, you know, over the years" with the victim. Her use of the name "Donny" for the victim further evinces a close personal relationship with the victim.

¶ 43. We also find it significant that the victim, Donald Harmacek, had a long-standing business relationship with D.F. and her parents. D.F. stated that she worked at her parents' establishment, which evidently was a bar/restaurant. Although D.F.'s parents no longer owned and operated the bar/restaurant (her father had recently died), it cannot be overlooked that D.F. said that the victim was the distributor for "*our* place of business." Coupled with the fact that D.F. said she was "close friends" with the victim, this strong business relationship weighs heavily in our determination that D.F. was objectively biased.

¶ 44. D.F. also stated that she had last seen witness Shirley Otto, Harmacek's long-time companion, a few weeks earlier but had not otherwise seen her since Harmacek's death, except at "the funeral home that night." We take this reference to mean that D.F. and her mother attended Harmacek's visitation or funeral.

714

D.F.'s presence at the funeral home is powerful evidence that D.F. and her family were close to the victim.

¶ 45. It is also relevant that D.F. discussed the death of Harmacek with her mother. She moved in with her mother after her father's death, the year before Harmacek was murdered. She indicated that Harmacek's death was "hard" on her mother. Such an environment might lead to sympathy for the victim because D.F. indicated that her parents were closer to Harmacek than she was.

¶ 46. The nature of the crimes also plays a role in our decision. Harmacek was brutally murdered and his house was torched; we should not expect a person in D.F.'s situation to be indifferent in judging the guilt or innocence of a person charged with committing those acts.

¶ 47. During the individual voir dire of D.F., defense counsel mentioned that D.F. had appeared to start crying during the earlier general voir dire. D.F. did not deny counsel's statement but instead replied: "I feel very confident. Like I say, I knew him, but as far as personal, I think my parents knew him more personal than I did." After the individual voir dire, defense counsel argued to the court that he noticed D.F. starting to cry earlier that day. The circuit court judge said that he did not notice such a reaction. We find it significant that D.F. did not deny crying nor respond to counsel's observation in any direct way. According to our reading of the voir dire record, D.F. was normally quite assertive in her responses, frequently interrupting counsel. The circuit court should have explored through questioning whether counsel's observations of D.F. were correct.

¶ 48. It is not always enough that a prospective juror assures counsel or the court that he or she will be

impartial. Circuit courts are often in a better position to judge whether a prospective juror is biased, or potentially biased, than is the prospective juror. For example, the circuit court will almost always have a better appreciation for the evidence that is going to be presented in the trial than the prospective juror. As the defendant points out, the relationship of D.F. to the *victim*—as opposed to a *witness*—meant that D.F. would confront a great deal of evidence concerning Harmacek's death. This evidence was likely to include testimony from a forensic expert, photos of the crime scene, and autopsy photos of the victim. The circuit court was in a better position than D.F. to judge the likely effect of this evidence on her because of her relationship to the victim.

■

¶ 49. We take this opportunity to restate that "we caution and encourage the circuit courts to strike prospective jurors for cause when the circuit courts 'reasonably suspect' that juror bias exists." *Ferron*, 219 Wis. 2d at 495–96. This is a decades-old standard, *Kanzenbach v. S.C. Johnson & Son, Inc.*, 273 Wis. 621, 627, 79 N.W.2d 249 (1956), that encourages circuit courts "to err on the side of striking prospective jurors *who appear to be biased*, even if the appellate court would not reverse their determinations of impartiality. Such action will avoid the appearance of bias, and may save judicial time and resources in the long run." *Ferron*, 219 Wis. 2d at 503 (emphasis added). As Justice William A. Bablitch said in dissent in *State v. Louis*, 156 Wis. 2d at 486: "It is the appearance of partiality that gives great pause. Jurors must not only be fair and impartial; they must also not have a relationship to

either side which leaves doubt about their impartiality."[6]

¶ 50. Prospective juror D.F. was objectively biased and should have been struck for cause. The facts show that a reasonable person in D.F.'s position could not have remained fair and impartial.

## V. REMEDY

¶ 51. Now that we have determined that D.F. should have been struck for cause, we consider the proper remedy for this error. This court's decision in *State v. Ramos* would require that we reverse Lindell's conviction and remand his case for a new trial. Yet, there is no serious argument that the defendant did not commit the offenses of which he was convicted, or that he did not receive a fair trial by an impartial jury. Hence, reversal of Lindell's conviction is counterintuitive and would certainly lead to a costly and time-consuming new trial.

---

[6] We also find it noteworthy that the circuit court apparently had many extra prospective jurors available on the day of jury selection. The circuit court judge commented to the prospective jurors in court that he released a number of prospective jurors once the parties had chosen a jury. While it is not at all part of our assessment of whether D.F. was objectively biased, we note this fact only to stress that the circuit court should have felt no pressure to keep D.F. on the panel. The circuit court's unreasonable assessment of objective bias in this case is particularly troublesome in light of the heightened scrutiny already on the venire. The pretrial motions relating to publicity and media attention, as well as the venire's general familiarity with the case, should have put the circuit court on guard to dismiss D.F., as there was overwhelming evidence of objective bias.

717

¶ 52. The harsh reality of this option forces us to reexamine whether the result dictated by the *Ramos* decision makes sense for our system of justice on an ongoing basis. We conclude that it does not. Consequently, the *Ramos* decision is overruled.

¶ 53. We base our decision to overrule *Ramos* on several factors. First, the *Ramos* decision neglected to fully describe and analyze long-standing Wisconsin law on peremptory challenges and harmless error. Second, the court read too much into the Supreme Court's decision in *Ross v. Oklahoma*, 487 U.S. 81 (1988), and did not anticipate the decision in *United States v. Martinez-Salazar*, 528 U.S. 304 (2000). Third, the court has recognized some disturbing systemic problems that came out of the *Ramos* decision. Finally, the court has taken significant steps to address the issue of juror bias.

A. *State v. Ramos*

¶ 54. The rule in *Ramos* is that: "[T]he use of a peremptory challenge to correct a trial court error is adequate grounds for reversal because it arbitrarily deprives the defendant of a statutorily granted right." 211 Wis. 2d at 14. We revisit the case to understand how the court made this ruling.

¶ 55. Edward Ramos was convicted of first-degree intentional homicide in the death of his girlfriend's two-year-old son. *Id.* at 15. There was an extensive voir dire of prospective jurors before his trial. Because of the nature of the case, one prospective juror expressed doubt whether she could be fair. When she was pressed on the subject, she said: "Just knowing that the child was suffocated, I guess I couldn't be fair." The defense attorney followed up: "So you could not be

fair to this man?" The prospective juror replied: "No."
*Id.*

¶ 56. In chambers, Ramos's counsel moved to
strike the juror for cause. The circuit court refused to
strike the juror for cause. When the judge and the pros-
ecutor said they did not recall the prospective juror
saying that she could not be fair, defense counsel asked
that the reporter read back the prospective juror's
responses. Three times counsel asked that the prospec-
tive juror's responses be read back and three times he
was denied, and the court refused to strike the juror for
cause. As a result, Ramos exercised the first of his
seven peremptory challenges to remove the prospective
juror and she did not sit at the trial. *Id.* at 14–15.

¶ 57. When the case came to this court after
Ramos's conviction, we noted that the circuit court's
action violated Wis. Stat. § 805.08(1) in two respects:
(1) a prospective juror who is not indifferent in a case
"shall be excused," but this prospective juror was not;
and (2) any party objecting for cause to a prospective
juror may introduce evidence in support of the objec-
tion, but three times Ramos was denied that right. This
court concluded that the failure to excuse the suspect
juror was an erroneous exercise of discretion by the
circuit court. *Id.* at 16.

¶ 58. This court structured its analysis of consti-
tutional questions to conform to our understanding of
*Ross*, 487 U.S. 81. It acknowledged that a defendant's
right to a full complement of peremptory strikes was
not grounded in the Sixth Amendment but rather in
state law. Citing *Ross*, we stated that peremptory chal-
lenges are "creatures of state law" and that it is " 'for
the state to determine the number of peremptory chal-
lenges allowed and to define their purpose and the
manner of their exercise.' " *Ramos*, 211 Wis. 2d at 18

(quoting *Ross*, 487 U.S. at 89). Thus, " 'the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides.' " *Id.* at 18–19 (quoting *Ross*, 487 U.S. at 89). In short, we concluded that our task was to configure the peremptory rights of a criminal defendant in Wisconsin on the basis of Wisconsin law.

¶ 59. The court then concluded that Wisconsin gives a criminal defendant a mandatory right to a specific number of peremptory challenges. It does not, we said, require the defendant to use peremptory challenges against a prospective juror who should have been removed for cause. *Ramos*, 211 Wis. 2d at 19 (citing *State v. Gesch*, 167 Wis. 2d 660, 671, 482 N.W.2d 99 (1992)). The court recognized the importance that has been accorded to peremptory challenges over our history and formulated the rule of automatic reversal. *Id.*

¶ 60. Two members of the court, Justice N. Patrick Crooks and Justice Ann Walsh Bradley, strongly disagreed with the court's decision. Justice Crooks wrote:

> I dissent because I conclude that the circuit court did not deprive Edward Ramos of his right to the effective exercise of a peremptory challenge under Wisconsin law. Instead, I conclude that by using a peremptory challenge to strike a juror who should have been excused for cause, Ramos effectively exercised this challenge for the purpose it is intended—to impanel an impartial jury. Further, I conclude that Ramos is not entitled to automatic reversal of his conviction because it is well established that, in cases like this, the defendant is not entitled to a new trial unless a biased juror actually sat on the jury. Consequently, I conclude that Ramos' challenge under the Fourteenth Amendment to the United States Constitution must fail

because he was not deprived of any right to which
he was entitled under Wisconsin law.

*Id.* at 30–31 (Crooks, J., dissenting).

¶ 61. Justice Crooks argued that it was not improper for a defendant to use a peremptory strike to cure a circuit court error.

The majority essentially concludes that, under
Wisconsin law, if a defendant uses a peremptory
challenge to strike a "for cause" juror, the defendant
is thereby deprived of the effective exercise of that
· challenge because he or she did not use it to strike a
juror for "no cause," i.e., based on a hunch or
intuition.

*Id.* at 33 (Crooks, J., dissenting). He cited four Wisconsin cases including *Carthaus v. State*, 78 Wis. 560, 47 N.W. 629 (1891), which reached conclusions contrary to the majority opinion.

¶ 62. Justice Bradley reiterated her concern with the *Ramos* decision the following year in *State v. Ferron*:

As the dissent in *Ramos* succinctly noted, stat-
utory peremptory challenges exist not to allow
defendants to randomly shuffle a jury pool in their
favor, but rather to ensure the impaneling of an
impartial jury as a component of our constitutional
guarantee of a fair trial. When a defendant exer-
cises a peremptory challenge to strike a juror who
should have been excused by the court for cause, the
defendant also acts to ensure that an unbiased trier
of fact considers the case.

. . . .

Although *Ramos* is a recent decision of this
court, its rationale is no more correct today than it
was one year ago when it was decided. While I agree
that the doctrine of stare decisis deserves great

weight in our jurisprudence, it seems incongruous to refuse to reconsider the decision solely on stare decisis grounds when. . .*Ramos* itself disregarded a line of precedent spanning over a century in reaching its conclusion.

*Ferron*, 219 Wis. 2d at 514–15 (Bradley, J., dissenting).

¶ 63. For this court, time and events have put the *Ramos* decision in a new light. We have reexamined our premises, and conclude that *Ramos* should be overruled.

B. State Law on Peremptory Challenges and Harmless Error

¶ 64. The *Ramos* decision did not fully describe and analyze long-standing Wisconsin law on peremptory challenges and harmless error. As a result, it presented a distorted view of Wisconsin law.

¶ 65. The Wisconsin Statutes have long given peremptory challenges to criminal defendants. For instance, Wis. Stat. Ch. 148, §§ 3, 5 (1849) provided:

> Sec. 3. Every person indicted for any offence, shall, when the jury is impannelled for his trial, be entitled to the same challenges that are allowed by law to defendants in civil causes.
>
> . . . .
>
> Sec. 5. Any person who is put on trial for an offence punishable with death, shall be allowed to challenge peremptorily twenty-four of the persons returned as jurors and no more.

*See also* Wis. Stat. Ch. 191, § 4689 (1889); Wis. Stat. Ch. 191, § 4690 (1889); Wis. Stat. § 357.03 (1925); Wis. Stat. § 957.03 (1955); Wis. Stat. § 957.03 (1967); Wis. Stat. § 972.03 (1999–2000).

¶ 66. At the same time, from statehood until 1976, there was always a specific statute protecting the verdict from challenges for irregularity in impaneling jurors, except in certain situations. For instance, Wis. Stat. Ch. 97, § 29 (1849) provided:

> Sec. 29. No irregularity in any writ of venire facias, or in the drawing, summoning, returning or empanelling of petit jurors, shall be sufficient to set aside a verdict, unless the party making the objection was injured by the irregularity, or unless the objection was made before the returning of the verdict.

*See also* Wis. Stat. Ch. 118, § 30 (1858); Wis. Stat. Ch. 128, § 2881 (1898); Wis. Stat. § 270.52 (1925); Wis. Stat. § 270.52 (1973); Judicial Council Committee Note, 1974, Wisconsin Rules of Civil Procedure, 67 Wis. 2d 585, 715 (1976).

¶ 67. The two exceptions listed in these statutes were (1) when the party making the objection was injured by the irregularity, or (2) when the objection was made before the returning of the verdict.

¶ 68. The second exception in these statutes, that objection must be made before the returning of the verdict, was consistently interpreted in light of another statute that dates from the early years of the state's history. Wisconsin's general harmless error statute has been in effect since Chapter 120, Laws of 1856 set out to establish "an uniform course of proceeding, *in all cases* (emphasis added)." Section 84 of the Chapter provided:

> Sec. 84. The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings, which shall not affect the substantial rights of the adverse party; and no judg-

ment shall be reversed or affected by reason of such error or defect.

This statute has appeared in substantially the same form since 1856. *See* Wis. Stat. Ch. 125, § 40 (1858); Wis. Stat. Ch. 127, § 2829 (1878); Wis. Stat. Ch. 127, § 2829 (1898); Wis. Stat. § 269.43 (1925); Wis. Stat. § 269.43 (1973); Wisconsin Rules of Civil Procedure, 67 Wis. 2d 585, 714 (1976); Wis. Stat. § 805.18(2) (1999–2000).[7]

¶ 69. This general prohibition against reversal of a judgment for error or defect in proceedings unless the error affects substantial rights now appears in Wis. Stat. § 805.18(2), our "harmless error" statute. This statute applies to criminal cases. *State v. Dyess*, 124 Wis. 2d 525, 547, 370 N.W.2d 222 (1985). Wisconsin Stat. § 805.18 is especially pertinent to this case because it is "substantially equivalent to ss. 269.43 and 270.52," the *general* harmless error statute and the *specific* "irregularities in venires" statute that were replaced when this court issued the order creating § 805.18. *See* Judicial Council Committee's Note, 1974, Wisconsin Rules of Civil Procedure, 67 Wis. 2d 585, 714 (1976).

¶ 70. The *Ramos* majority neglected to discuss this statute that specifically mentions errors in the selection of a jury:

> No judgment shall be reversed or set aside or new trial granted in any action or proceeding *on the ground of selection or misdirection of the jury*, or the improper admission of evidence, or for error as to

---

[7] The 1849 version of the Wisconsin Statutes contains a harmless error statute, though it is in quite different form than the 1856 version and the statutes that followed. *See* Wis. Stat. Ch. 100, § 7 (1849).

any matter of pleading or procedure, *unless* in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that *the error complained of has affected the substantial rights of the party* seeking to reverse or set aside the judgment, or to secure a new trial.

Wis. Stat. § 805.18(2) (emphasis added). Moreover, when the court brushed aside two "19th century" cases cited in the *Ramos* dissent, *Pool v. Milwaukee Mechanics Ins. Co.*, 94 Wis. 447, 453, 69 N.W. 65 (1896), and *Bergman v. Hendrickson*, 106 Wis. 434, 82 N.W. 304 (1900), it was brushing aside cases that made explicit or implicit references to the harmless error statutes.

¶ 71. The best discussion of the point appears in *Pool*:

> [T]here is also presented the question whether the court erred in overruling a challenge of a juror for cause, and, if so, whether that is reversible error, in view of the fact that the objectionable juror did not sit upon trial of the case. On this point, *People v. Casey*, 96 N. Y. 115, is confidently relied upon. That is to the effect that if, by the erroneous ruling, the party is obliged to exhaust all his peremptory challenges, the error is harmful. The record here does not show such a case. It shows that all the peremptory challenges were exhausted, but not that the last challenge was used in striking from the panel the objectionable juror, or that the ruling was the cause which compelled such exhaustion of the challenges. The true rule, we hold, is laid down in *Spies v. People*, 122 Ill. 1, to the effect that it is not prejudicial error to overrule a challenge for cause, unless it is shown that an objectionable juror was forced upon the party, *and sat upon the case after such party had exhausted his peremptory challenges.*

This court substantially adopted that view in *Grace v. Dempsey*, 75 Wis. 313, where it is said in the opinion by Mr. Justice Cassoday, discussing a similar subject, "*The statute expressly precludes this court from reversing any judgment for any error not affecting the substantial right of the appellant. R.S. sec. 2829.*" There is nothing in the record to indicate that by such ruling the defendant was in any way prejudiced.

94 Wis. at 453 (emphasis added).[8] The statute of which *Pool* spoke was the general harmless error statute. Wis. Stat. Ch. 127, § 2829 (1889).

¶ 72. In *Grace v. Dempsey,* the court said:

[T]he trial court must necessarily exercise a very large discretion in the impaneling of a jury; and the exercise of such discretion will not be disturbed except in case of its abuse or the violation of some rule of law. *Santry v. State,* 67 Wis. 67; *Sutton v. Fox,* 55 Wis. 531; *Olson v. Solveson,* 71 Wis. 663; Thomp. & M. Juries, §§ 258, 270, 271. *The statute expressly precludes this court from reversing any judgment for any error not affecting the substantial right of the appellant. Sec. 2829, R. S.* There is nothing in the record to indicate that by such ruling the defendants were in any way prejudiced.

75 Wis. 313, 321, 43 N.W. 1127 (1889) (emphasis added). As noted, *Grace* specifically cited the general harmless error statute.

¶ 73. In *Bergman v. Hendrickson,* the court said:

---

[8] This court held similarly in *Kohler v. West Side Railroad Co.,* 99 Wis. 33, 36–37, 74 N.W. 568 (1898) ("[I]t is not prejudicial error to overrule a challenge for cause unless it is shown that an objectionable juror was forced upon the party, and sat upon the case, after such party had exhausted his [or her] peremptory challenges.").

> An error assigned to a refusal to discharge a juror on challenge for cause cannot serve for reversal, since no prejudice resulted to appellants. The juror was removed on peremptory challenge, and no objection was made to the jury as finally impaneled. *Emery v. State*, 101 Wis. 627; *Cornell v. State*, 104 Wis. 527.

*Bergman v. Hendrickson*, 106 Wis. 434, 438–39, 82 N.W. 304 (1900). This decision is consistent with harmless error analysis.

¶ 74. Both the *Ramos* majority and dissent discussed *Carthaus v. State*, 78 Wis. 560, 47 N.W. 629 (1891), in which two defendants used their "eighth and last peremptory challenge" to strike a prospective juror who allegedly should have been struck for cause. But the majority dismissed the case, saying: "Without any analysis, this court in the *Carthaus* case quipped: 'A fair and impartial jury was impaneled, and what more could the defendants ask for?' " *Ramos*, 211 Wis. 2d at 34. By contrast, the dissent discussed the case at length, referring to passages in the 1890 briefs, arguments of counsel, and quotes from the opinion.

¶ 75. In *Carthaus*, the court began its opinion as follows: "So many exceptions are relied on for a reversal of the judgment in this case that each exception can only be noticed in the briefest manner, in order to avoid extending this opinion to an inordinate length." 78 Wis. at 562. This passage helps to explain the court's relatively brief discussion of the peremptory challenge issue. Among the many claims were four challenges to jurors or potential jurors. At one point in the opinion the court said:

> Another error assigned is that the court permitted A. J. Lumsden to stand as a juror, after it appeared from his examination on the voir dire that

he had been previously called as a juror at the for-
mer trial of the cause, and had been excused by the
court. It appears from the record that Lumsden had
been summoned as a juror on the first trial, but did
not sit in the cause, being excused by the court. On
this trial he was peremptorily challenged by the
defendants, and set aside. We think he was quali-
fied to try the cause, but as he did not there can be
no objection to the conviction on that ground.

*Id.* at 566.

¶ 76. Later in the opinion the court took up
another challenge, saying:

As to the objection to the juror Wayland Chap-
lain, we think it has no merit. He was peremptorily
challenged by the defendants, and set aside. It is
said the defendants should not have been put to
their peremptory challenges as to this juror and
Lumsden, because in so doing they exhausted their
peremptory challenges; but it does not appear that
they were prejudiced in any way by that fact. A fair
and impartial jury was impaneled, and what more
could the defendants ask for?

*Id.* at 568.

¶ 77. Several points may be taken from the
*Carthaus* case. First, the court made two rulings on
peremptory strikes after the defendants challenged
prospective jurors for cause. The court's reference to
"prejudice" is completely consistent with the two rele-
vant harmless error statutes in effect at that time.
Second, the *Carthaus* decision came only 13 months
after *Grace v. Dempsey*, 75 Wis. at 320–21, a case which
had extensive discussion of the issues and cited three
Wisconsin cases; Wis. Stat. Ch. 127, § 2829 (1889); and
a treatise on juries. Third, the court's pithy summary of
the law represented the tenor of Wisconsin law until

the *Ramos* case. For example, in *Schoeffler v. State*, 3 Wis. 717, [*823], 729, [*836] (1854), the court heard a challenge to a prospective juror named Morley, who in the end did not serve on the defendant's jury. The court said:

> Whether the juror Morley was challenged peremptorily by the prosecution or by the defendants, does not appear. If he was thus challenged by the prosecution, the defendants were not injured. If challenged by the defendants, that fact should appear upon the record.
> . . .The name of not one of the jurors sworn and examined, as set forth in the bill of exceptions, was retained upon the list of jurors ultimately impaneled to try the issue. Upon the completion of the panel of jurors who tried the issue, it seems that the defendants had exhausted but thirty-seven peremptory challenges. In consequence of the overruling of the challenges "for cause," of the defendants, not one of the objectionable jurors were retained, and *we cannot perceive how the defendants could have been injured, even admitting the position of their counsel to be correct.*

*Schoeffler*, 3 Wis. at 729 [*836] (emphasis added).

¶ 78. In *State v. Mendoza*, this court unanimously issued an opinion in which the court applied Wis. Stat. § 805.18(2) to a jury selection case. 227 Wis. 2d at 864.

¶ 79. *Mendoza* was not the first time that we applied a harmless error analysis in a jury selection case in recent years. For example, this court explicitly addressed the applicability of harmless error statutes

in *State v. Coble*, 100 Wis. 2d 179, 209–11, 301 N.W.2d 221 (1981).[9]

¶ 80. In *Coble* we examined Milwaukee County's process of compiling juror lists. We applied a harmless error analysis, noting that previously Wis. Stat. § 270.52 (1973) regulated "when a verdict or judgment shall be set aside or a new trial granted on an objection to certain stages of the jury selection process." *Coble*, 100 Wis. 2d at 209. The court noted that Wis. Stat. § 805.18(2) replaced the prior statute on January 1, 1976, and § 805.18(2), "according to the Judicial Council Committee's Note, 1974, is substantially equivalent to sec. 270.52, Stats." *Id. Coble* also said:

> This court, in assessing jury challenges in prior cases, has stated that irregularities in the process are immaterial unless it appears probable that there has been prejudice. "The rule in this state is that irregularities in the selection of jurymen are to be disregarded unless it appears probable that the person seeking to take advantage thereof has been prejudiced thereby. *Ullman v. State* (1905), 124 Wis. 602, 609, 103 N.W. 6." *Petition of Salen*, 231 Wis. 489, 491, 286 N.W. 5 (1939). *Accord Pamanet v. State*, 49 Wis. 2d 501, 509, 182 N.W.2d 459 (1971). In other cases this court has indicated that it will review a challenge to the selection of the "jury array" that is to the preparation of the jury list to determine if there was a violation "in any material respect" or whether there was "substantial compli-

---

[9] *See also State v. Chosa*, 108 Wis. 2d 392, 402, 321 N.W.2d 280 (1982) (declaring that erroneous exclusion of class of jurors required a new trial because the defendant's substantial rights were affected under Wis. Stat. § 805.18(2)); *State v. Lehman*, 108 Wis. 2d 291, 314, 321 N.W.2d 212 (1982) (applying one-time harmless error analysis when court determined substitution of an alternate juror during jury deliberations was error).

ance" with the jury selection statute. *State v. Nutley*, 24 Wis. 2d 527, 540, 129 N.W.2d 155 (1964), *cert. denied* 380 U.S. 918 (1965); *State v. Bond*, 41 Wis. 2d 219, 227, 163 N.W.2d 601 (1969).

*Id.* at 211. We recognize that these cases relate to the composition of the venire but conclude that the application of harmless error analysis is instructive and relevant. In *Coble*, this court analyzed what was then a relatively new harmless error law (Wis. Stat. § 805.18(2)) and said: "The legislature intended the doctrine of harmless error to apply to jury selection." 100 Wis. 2d at 201–11.

¶ 81. In one of the last major jury cases before *Ramos*, *State v. Traylor*, the court of appeals said:

> There is no constitutional right to peremptory challenges; there is only a constitutional right to an impartial jury. *Ross v. Oklahoma*, 487 U.S. 81, 85, 88 (1988). Any claim that a jury is not impartial must focus not on the jurors who were removed by peremptory challenges but on the jury that actually sat in the case. *See id.* at 85–86. Where there is no showing that any of the actual jurors were biased, it would be speculative for a court to conclude that the jury would have been fairer if counsel had been allowed to preserve peremptory challenges on other, unspecified members of the jury venire. Moreover, there would be no stopping point if the deprivation of such speculative benefit, standing by itself, could establish prejudice.

170 Wis. 2d 393, 400, 489 N.W.2d 626 (Ct. App. 1992). The court referred to "harmless error" and then said:

> [T]he state argues that even if counsel was ineffective, this performance did not prejudice the defendant. . . .The reason for this is that, under old and never overruled Wisconsin law, Traylor cannot

prove prejudice unless he can show that the exhaustion of peremptory challenges left him with a jury that included an objectionable or incompetent member. *Pool v. Milwaukee Mechanics Ins. Co.*, 94 Wis. 447, 453, 69 N.W. 65, 67 (1896). Wisconsin's long-standing rule is that where a fair and impartial jury is impaneled, there is no basis for concluding that a defendant was wrongly required to use peremptory challenges. *See Carthaus v. State*, 78 Wis. 560, 568, 47 N.W. 629, 631 (1891).

*Id.*

█

¶ 82. Considering *Traylor*'s clear and trenchant summary of the law, including its explicit reference to "harmless error" and "prejudice" to the defendant, this court should have confronted Wis. Stat. § 805.18(2) and the state's long history of statutes and cases linking the impaneling of jurors to harmless error, when we decided *Ramos*. We did not do so.[10] Consequently, this court could not reasonably conclude that the legislature had mandated the result we reached. The legislature had mandated exactly the opposite result.

C. *United States v. Martinez-Salazar*

¶ 83. Looking backward, we can see that the *Ramos* decision read too much into the Supreme

---

[10] The issue of whether Wis. Stat. § 805.18(2) applies to jury selection cases was not briefed by either the defendant or the State in *Ramos*. Consequently, the court was not able to fully consider the current § 805.18(2) and the 150-year history of harmless error's relationship to peremptory challenge statutes in this state. In addition, neither the State nor any defendant has raised the harmless error statute in any brief to this court in any of the juror bias cases since *Ramos*.

Court's decision in *Ross v. Oklahoma* and did not anticipate the decision in *Martinez-Salazar*.

¶ 84. The *Ross* court was closely divided.[11] The case involved a homicide defendant subject to the death penalty. The trial judge erred in declining to excuse a juror who should have been excused for cause. The defendant was required to use one of his nine peremptory strikes to cure the error, as provided by Oklahoma law. The Supreme Court did not reverse the conviction, rejecting the argument that the use of a peremptory challenge to correct an error was a violation of the Sixth Amendment right to an impartial jury. The Court said: "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross*, 487 U.S. at 88.

¶ 85. The Court also rejected the argument that the use of the peremptory to correct the judge's error violated "his Fourteenth Amendment right to due process by arbitrarily depriving him of the full complement of nine peremptory challenges allowed under Oklahoma law." *Id.* at 89. But the Court then backpedaled from its holding by stressing that Oklahoma law *required* a defendant to use a peremptory to eliminate the prospective juror "in order to preserve the claim that the ruling deprived him of a fair trial." *Id.* "Even then, the error is grounds for reversal only if the defendant exhausts all peremptory

---

[11] *Ross* was decided by a five-person majority of the Court. Chief Justice Rehnquist wrote the majority opinion and Justice Marshall wrote a dissent in which three others joined. Justice Marshall's dissent began: "A man's life is at stake. We should not be playing games." *Ross v. Oklahoma*, 487 U.S. 81, 91 (1988) (Marshall, J., dissenting).

challenges and an incompetent juror is forced upon him." *Id.*

¶ 86. The Court stated that because peremptory challenges are creatures of statute and are not required by the Constitution, "it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise." *Id.* Only if the defendant does not receive "that which state law provides" is there a viable due process claim. *Id.* In a footnote, the Court said:

> We need not decide the broader question whether, in the absence of Oklahoma's limitation on the "right" to exercise peremptory challenges [requiring the defendant to use peremptories curatively], "a denial or impairment" of the exercise of peremptory challenges occurs if the defendant uses one or more challenges to remove jurors who should have been excused for cause. See *Swain v. Alabama*, 380 U.S. 202, 219, 85 S. Ct. 824, 835, 13 L. Ed. 2d 759 (1965); cf. *Spies v. Illinois*, 123 U.S. 131, 8 S. Ct. 21, 22, 31 L. Ed. 80 (1887); *Stroud v. United States*, 251 U.S. 380, 382, 40 S. Ct. 176, 177, 64 L. Ed. 317 (1920), denying rehearing to 251 U.S. 15, 40 S. Ct. 50, 64 L. Ed. 103 (1919).

*Id.* at 91 n.4.

¶ 87. These statements opened the door to argument that impairment of state-created rights to peremptory challenges violated due process. The Court's footnote used the phrase "a denial or impairment" after it had quoted a sentence in *Swain v. Alabama*: "The denial or impairment of the right is reversible error without a showing of prejudice." 380 U.S. at 219. The *Ramos* opinion also quoted this sentence, 211 Wis. 2d at 18, and that undoubtedly contributed to our failure to engage in harmless error

analysis. *Ramos* relied heavily upon *Ross* and its quotation of *Swain*; the *Ramos* radix *is* the automatic reversal rule implied by *Ross/Swain*.

¶ 88. In *Martinez-Salazar,* the Supreme Court confronted, in a federal case, the very situation contemplated in footnote 4 of the *Ross* decision: "the erroneous refusal of a trial judge to dismiss a potential juror for cause, followed by the defendant's exercise of a peremptory challenge to remove that juror." 528 U.S. at 307. That puts the case on a par with this case and *Ramos.* The Court stated its view on peremptory challenges directly: "A hard choice is not the same as no choice. Martinez-Salazar, together with his codefendant, received and exercised 11 peremptory challenges (10 for the petit jury, one in selecting an alternate juror). That is all he is entitled to under the Rule." *Id.* at 315.

¶ 89. The Court thereafter stated:

> In choosing to remove [the prospective juror] rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. See, e.g., *J.E.B. [v. Alabama ex rel. T.B.,* 511 U.S. 127, 137 n.8], 114 S. Ct. 1419 [(1994)], (purpose of peremptory challenges " 'is to permit litigants to assist the government in the selection of an impartial trier of fact' ") (quoting *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 620, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991)); *Georgia v. McCollum,* 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992) (peremptory challenges are "one state-created means to the constitutional end of an impartial jury and a fair trial"); *Frazier v. United States,* 335 U.S. 497, 505, 69 S. Ct. 201, 93 L. Ed. 187 (1948) ("the right [to peremptory challenges] is given in aid of

the party's interest to secure a fair and impartial jury").

*Id.* at 315–16.[12]

¶ 90. The Court summarized its decision: "We answer today the question left open in *Ross* and hold that a defendant's exercise of peremptory challenges. . .is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." *Id.* at 317.

■

¶ 91. The *Martinez-Salazar* opinion applies only to federal cases. It is not binding upon state courts. However, the Court's opinion settles the critical question whether the required use of a peremptory challenge to correct a trial court error is "a denial or impairment" of an important right. It is not "a denial or impairment" of a due process right unless a full complement of unencumbered peremptory challenges is required by state law.

¶ 92. The sentence in *Swain v. Alabama* may make good sense in the appropriate circumstances; that is, if "a trial court repeatedly and deliberately misapplied the law in order to force petitioner to use his peremptory challenges to correct these errors,"

---

[12] Although there were two short concurring opinions in *Martinez-Salazar*, all nine members of the Court expressed the notion that one of the reasons for peremptory challenges is to correct errors in failing to strike for cause. *United States v. Martinez-Salazar*, 528 U.S. 304, 315–16 (2000); *id.* at 318 (Souter, J., concurring) ("Martinez-Salazar simply made a choice to use his peremptory challenge curatively."); *id.* (Scalia, J., concurring) ("The fact that he voluntarily chose to expend [a peremptory challenge] upon a venireman who should have been stricken for cause makes no difference.").

*Ross*, 487 U.S. at 91 n.5, or if there were a "substantial impairment" of the right to exercise peremptory challenges. *Martinez-Salazar*, 528 U.S. at 317 n.4. *Swain* in fact cited several 19th century cases that involved errors in jury selection, *Lewis v. United States*, 146 U.S. 370 (1892) (defendant not present during challenge process); *Harrison v. United States*, 163 U.S. 140 (1896) (defendant denied the number of peremptories to which he was entitled); *Gulf, Colorado & Santa Fe Ry. Co. v. Shane*, 157 U.S. 348 (1895) (defendant forced to exercise peremptories without having the entire pool from which to strike). Whether such errors would now require an automatic reversal under the federal or state constitutions—in light of the dramatic changes in harmless error review in this century[13] —is a question we need not answer in this case. *See Martinez-Salazar*, 528 U.S. at 317 n.4. This case does not involve the type of error present in those early cases.

¶ 93. As a result of the Supreme Court's decision in *Martinez-Salazar*, at least one other state court has changed its "*Ramos*" rule of automatic reversal, and other courts have discussed doing so. Shortly after the release of *Martinez-Salazar*, the Supreme Court of North Dakota abandoned its automatic reversal rule. *Compare State v. Entzi*, 615 N.W.2d 145, 149 (N.D. 2000) (adopting *Martinez-Salazar* approach and finding that curative use of a peremptory is not a violation of a statutory right) *with City of Dickinson v. Lindstrom*, 575 N.W.2d 440, 444 (N.D. 1998) (citing *Swain* for the rule that denial of a peremptory compels an automatic reversal). In addition, the Supreme Court of South Dakota recently decided a case in which it did not find a challenged juror was biased, but said:

---

[13] 5 Wayne R. LaFave, *Criminal Procedure* § 27.6(b)–(c) (2d ed. 1999).

[W]ere we to find the trial court erred in failing to remove a potential juror for cause, we would still reject Moeller's argument that the failure to remove the challenged jurors forced him to exhaust his peremptory challenges. The United States Supreme Court recently held that if a defendant elects to cure the erroneous refusal of a trial judge to dismiss a potential juror for cause by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any right under the Federal Rules of Criminal Procedure or the Constitution.

*State v. Moeller*, 616 N.W.2d 424, 441 n.8 (S.D. 2000) (commenting on *Martinez-Salazar*, 528 U.S. 304).[14]

---

[14] We also note that there is no clear majority rule when a peremptory challenge is used by a defendant on a prospective juror who should have been struck for cause.

For a sampling of states that require a showing of prejudice, i.e., a showing that a biased juror actually served on the jury, see *Minch v. State*, 934 P.2d 764, 769–70 (Alaska Ct. App. 1997); *Bangs v. State*, 998 S.W.2d 738, 744–45 (Ark. 1999); *State v. Pelletier*, 552 A.2d 805, 810 (Conn. 1989); *State v. Ramos*, 808 P.2d 1313, 1315 (Idaho 1991); *Dye v. State*, 717 N.E.2d 5, 18 n.13 (Ind. 1999); *State v. Neuendorf*, 509 N.W.2d 743, 747 (Iowa 1993); *State v. Anderson*, 603 N.W.2d 354, 356 (Minn. Ct. App. 1999) (citing *State v. Stufflebean*, 329 N.W.2d 314, 317 (Minn. 1983)); *Johnson v. State*, 754 So. 2d 576, 578 (Miss. Ct. App. 2000); *State v. Storey*, 40 S.W.3d 898, 904–05 (Mo. 2001); *State v. Entzi*, 615 N.W.2d 145, 149 (N.D. 2000); *Myers v. State*, 17 P.3d 1021, 1027–28 (Okla. Crim. App. 2000); and *State v. Menzies*, 889 P.2d 393, 399–400 (Utah 1994).

For a sampling of states that have an automatic reversal rule, i.e., do not require that a biased juror served on the jury to set aside a verdict, see *Uptain v. State*, 534 So. 2d 686, 687–88 (Ala. Crim. App. 1988); *People v. Cunningham*, 2001 WL 694040, *16, — P.3d — (Cal. 2001); *People v. Lefebre*, 5 P.3d 295, 307–08 (Colo. 2000); *Cummings v. State*, 715 So. 2d 944, 948

¶ 94. Justice James E. Keller of the Supreme Court of Kentucky recently criticized his state's rule in *Stopher v. Commonwealth*, 2001 WL 431274, at *21, — S.W.3d — (Ky. 2001) (Keller, J., dissenting) ("I am struck by the incongruity of these two conclusions—Stopher was tried by a fair and impartial jury, and I must vote to reverse. Accordingly, I believe this is an appropriate time to express my opinion that this Court should reconsider existing precedent decreeing that automatic reversible error exists whenever a trial court error implicates a defendant's exercise of peremptory challenges."); *see also State v. Purcell*, 18 P.3d 113, 117 n.2 (Ariz. Ct. App. 2001) ("In light of our conclusion that the trial court did not err, we need not resolve the discrepancy between [*State v. Huerta*, 855 P.2d 776, 777 (1993) (automatic reversal rule)] and *Martinez-Salazar*."); *Johnson v. State*, 43 S.W.3d 1, 12 (Tex. Crim. App. 2001) (Hervey, J., dissenting) (citing *Martinez-Salazar* and arguing that a defendant is not

(Fla. 1998) (citing *Hill v. State*, 477 So. 2d 553, 556 (Fla. 1985)); *State v. Kauhi*, 948 P.2d 1036, 1041 (Haw. 1997); *Commonwealth v. Hyatt*, 568 N.E.2d 1148, 1150 (Mass. 1991); *Commonwealth v. Ingber*, 531 A.2d 1101, 1105 (Pa. 1987); *State v. Short*, 511 S.E.2d 358, 360–61 (S.C. 1999); *Johnson v. State*, 43 S.W.3d 1, 5–7 (Tex. Crim. App. 2001); *David v. Commonwealth*, 493 S.E.2d 379, 381 (Va. Ct. App. 1997) (citing *Breeden v. Commonwealth*, 227 S.E.2d 734, 736–37 (Va. 1976)); and *State v. Fire*, 998 P.2d 362, 364 (Wash. Ct. App. 2000), *review granted by State v. Fire*, 11 P.3d 826 (2000). A number of these states impose procedural requirements before the grant of an automatic reversal on appeal, such as requiring the defendant to use all peremptory challenges, ask the trial court for additional peremptory challenges, or object to the composition of the jury before trial. *See, e.g., Cunningham*, 2001 WL 694040 at *16; *Lefebre*, 5 P.3d at 307–08, *Cummings*, 715 So. 2d at 948; *Johnson*, 43 S.W.3d at 5–7.

deprived of any statutory right when he or she uses a peremptory curatively).

D. Systemic Problems with *Ramos*

¶ 95. In the period since our *Ramos* decision, we have come to recognize some of the systemic problems our decision has created.

¶ 96. There is seldom a litmus test for bias in voir dire. Challenges for statutory bias are relatively easy to decide and should not prove a difficulty for the circuit court; but all other challenges for cause involve an element of discretion.

¶ 97. Justice Ruth Bader Ginsburg summed up the dilemma in *Martinez-Salazar*. Twice she quoted Judge Pamela Ann Rymer of the Ninth Circuit Court of Appeals who wrote that " 'trial courts, state and federal, rule on cause challenges by the minute.' " 528 U.S. at 310 (quoting *United States v. Martinez-Salazar*, 146 F.3d 653, 659 (1998) (Rymer, J., dissenting)). Justice Ginsburg then added:

> Challenges for cause and rulings upon them, as Judge Rymer observed, see *supra*, at 778–779, are fast paced, made on the spot and under pressure. Counsel as well as court, in that setting, must be prepared to decide, often between shades of gray, "by the minute." 146 F.3d, at 661.

*Id.* at 316 (quoting *Martinez-Salazar*, 146 F.3d at 661).

¶ 98. The multitude of fact-intensive challenges involving shades of gray are bound to produce some trial court error. This error is not likely to be deterred by the sanction of a new trial because there is no intent by the circuit court to commit error. We recognize that circuit judges must deal with a diverse group of prospective jurors, some of whom are eager to serve even

when they should not, others of whom will offer any excuse to escape from their civic duty.

¶ 99. One of our cases immediately after *Ramos* illustrates the difficulty. In *State v. Ferron*, the circuit court denied Ferron's request to excuse a prospective juror for cause after the juror said he "would certainly try" and "probably" could set aside his opinion that a criminally accused defendant who was truly innocent would take the stand and testify on his own behalf. This court determined that the prospective juror should have been excused because the juror was not "a reasonable person who was sincerely willing to put aside his opinion or bias." 219 Wis. 2d at 489.

¶ 100. Ferron had used a peremptory challenge to remove the prospective juror before trial—so that he received a fair trial by an impartial jury—but our court ruled that Ferron was deprived of his statutorily-defined right to due process of law when he was compelled to use one of his peremptory challenges, as provided by Wis. Stat. § 972.03. *Ferron*, 219 Wis. 2d at 485–86. This decision was grounded entirely on *Ramos* and the court declined the State's invitation to overrule the case.

¶ 101. Justice Janine Geske, who had been part of the *Ramos* majority, wrote a strong dissent. She said in part:

> I write separately to express my deep concern that the majority has substantially and inappropriately restricted the circuit court's discretion during the voir dire process. In almost every serious felony case, honest prospective jurors express concerns about the heinous factual allegations, the presumption of innocence, a prior record, other acts testimony, a defendant's option not to testify, evaluating a police officer's testimony in the same

manner as other witnesses, or the victimization of a child, elderly or disabled person. We encourage trial judges to explore those fears, biases, and natural reactions with the members of the prospective jury panel. Few people can honestly tell the court that they are bothered by some of these factors in the case and then absolutely, without equivocation, reassure the judge that they are certain they can disregard their concerns. Most honest people can only commit that they will do their best to be fair. The trial judge must then, based upon his or her own assessment of that person's sincerity and ability to be fair, decide whether that person is qualified to sit on that particular case.

. . .[T]he majority concludes that Mr. Metzler, whom none of us on this court ever heard or observed, maintained a manifest bias and could not be a fair juror. Exchanges like the one between Judge Naze and juror Metzler occur in Wisconsin courtrooms every day. Trial judges, in both civil and criminal cases, routinely make the type of assessment that Judge Naze did here.

*Id.* at 507 (Geske, J., dissenting).

¶ 102. Justice Bradley added her own dissent:

While I agree with the test adopted by the majority, I disagree with the court's application of that test here. In reversing the circuit court, the majority claims that the record does not indicate that the challenged juror in this case, Metzler, was sincerely willing to put aside his potential bias against a defendant that does not testify. However, this is not a case where the record indicates that a potential juror refused to put aside a procedural bias. This is also not a case where the circuit court ignored counsel's concern about a potential juror. Rather, this is a case where, based on extensive questioning, legal instruction, and first-hand

742

> assessment of Metzler's comments, the circuit court
> determined that the juror was willing to put aside
> his bias.

*Id.* at 509 (Bradley, J., dissenting).

¶ 103. The reality of *Ramos* is that whenever two members of the court of appeals or four members of the supreme court make a different call on bias than the circuit court, the automatic result is a new trial. This is the rule notwithstanding the absence of any deficiency in the first trial.

¶ 104. This puts the defendant in a "win-win" situation, as Justice Crooks explained in his *Ramos* dissent. 211 Wis. 2d at 39 (Crooks, J., dissenting). If the circuit court erroneously fails to exclude a prospective juror who should be struck for cause, the defendant may take his or her chances and refuse to exercise a peremptory challenge, wait until the jury renders its verdict, appeal if he or she does not like the result, and then receive a new trial. *Gesch*, 167 Wis. 2d 660. On the other hand, the defendant may exercise a peremptory challenge and strike the prospective juror, then claim after a trial that produces a bad result that his or her due process was violated. The latter rule applies even though the defendant's peremptory strike comes so quickly that the prosecutor has no chance to use a strike to correct the error. This sort of gamesmanship does not instill confidence in our system of justice.

¶ 105. An even more troublesome problem comes out of the *Ramos* decision. This court encourages circuit courts to liberally grant requested strikes for cause to avoid the appearance of bias. *Mendoza*, 227 Wis. 2d at 861; *Ferron*, 219 Wis. 2d at 495–96; *Kanzenbach*, 273 Wis. at 627. This immensely important policy objective conflicts with an appellate court's traditional role in trying to uphold jury verdicts and in deferring to circuit

court determinations whenever it reasonably can. There is a natural tendency in appellate courts to limit the scope of objective bias so as not to reverse the circuit court, for we may not reverse the circuit court on objective bias without ruling that the circuit judge reached a conclusion that no reasonable judge could reach.

¶ 106. Surely, this tension is reflected in the court of appeals decision in this case. *State v. Lindell*, 2000 WI App 180, ¶ 19, 238 Wis. 2d 422, 617 N.W.2d 500. This court is torn between a liberal definition of juror bias and a costly and largely senseless new trial.

¶ 107. Another disturbing element of the *Ramos* decision is that it requires a new trial in cases where the trial was nearly perfect and the verdict is unquestionably sound. Yet, we examine error in other situations—both statutory[15] and constitutional[16]—for harmful effect. Many of these situations involve error

---

[15] *E.g, State v. Walberg*, 109 Wis. 2d 96, 109, 325 N.W.2d 687 (1982) (ruling judge's failure to recuse himself contrary to Wis. Stat. § 757.19 constituted harmless error); *Rosado v. State*, 70 Wis. 2d 280, 285–86, 234 N.W.2d 69 (1975) (holding that judge's impermissible consideration of information prior to conviction under Wis. Stat. § 972.15(1) was harmless error); *State v. Garcia*, 2000 WI App 81, ¶ 1, 234 Wis. 2d 304, 610 N.W.2d 180 (finding harmless error in circuit court's failure to personally address a defendant entering a guilty plea, as required by Wis. Stat. § 971.08(1)(c) (1993–1994)); *State v. Harris*, 229 Wis. 2d 832, 839–40, 601 N.W.2d 682 (Ct. App. 1999) ("Deprivation of. . .the right of the defendant to be present and the right to have counsel present at jury selection [contrary to Wis. Stat. § 971.04(1)(c)] is subject to a 'harmless error' analysis."); *Oliver v. Heritage Mut. Ins. Co.*, 179 Wis. 2d 1, 11, 505 N.W.2d 452 (Ct. App. 1993) (ruling that circuit court's manipulation of the jury pool in order to obtain a more diverse array violated Wis. Stat. § 756.096(2), but was harmless error).

744

with more potential for harm than the present circumstance.

¶ 108. *Ramos* has placed one "right" on a pedestal above others, and it is not worthy to be there. We conclude that the case produces some systemic problems that require correction.

## E. Vindicating the Substantial Rights of the Defendant

¶ 109. This court has been very clear about the circuit court's role in jury selection. The appearance of bias should be avoided. *Louis,* 156 Wis. 2d at 478 (citing *Peters v. Kiff,* 407 U.S. 493, 502 (1972)). Circuit courts are advised to err on the side of striking jurors who

---

[16] Professor LaFave notes the multitude of constitutional violations that are subject to harmless error analysis:

> [I]mproper comment on the defendant's failure to testify; admission of evidence obtained in violation of the Fourth Amendment; admission of evidence obtained in violation of an accused's right to counsel; admission at trial of an out-of-court statement of a non-testifying codefendant in violation of the Sixth Amendment's Confrontation Clause; admission of evidence at the sentencing stage of a capital case in violation of the right to counsel; erroneous use during trial of defendant's silence following Miranda warnings; a restriction on a defendant's right to cross-examine in violation of the Sixth Amendment's Confrontation Clause; denial of the right to present exculpatory evidence, denial of the right to be present during a trial proceeding; denial of an indigent's right to appointed counsel at a preliminary hearing; a jury instruction containing an unconstitutional rebuttable presumption; a jury instruction containing an unconstitutional conclusive presumption; an unconstitutionally overbroad jury instruction in a capital case; the submission of an invalid aggravating factor to the jury in a capital sentencing proceeding, and even a misdescription of an element of the offense.

5 LaFave, *supra,* § 27.6(d), at 948–49 (footnotes omitted).

appear to be biased, even if the appellate court would not reverse their determinations of impartiality. *Mendoza*, 227 Wis. 2d at 864; *Ferron*, 219 Wis. 2d at 503. "Such action will avoid the appearance of bias, and may save judicial time and resources in the long run." *Ferron*, 219 Wis. 2d at 503.

¶ 110. To assist the bench and bar in analyzing juror bias, this court initiated a major effort two years ago to clarify the law. *Faucher*, 227 Wis. 2d 700; *Kiernan*, 227 Wis. 2d 736; *Erickson*, 227 Wis. 2d 758; *Mendoza*, 227 Wis. 2d 838. These cases followed on the heels of two other decisions, *Ferron*, 219 Wis. 2d 481, and *Delgado*, 223 Wis. 2d 270, in which the court itself struggled with confusing concepts and awkward terminology. It is our avowed hope that these new cases will provide a proper analytical framework for making and resolving challenges for cause.

¶ 111. In this new environment, we are able to abandon *Ramos* and return to analyses of juror bias claims under Wis. Stat. § 805.18(2).[17] Under this statute, we first determine whether the circuit court erred, using the appropriate standard of review for each type of bias claim. Then, if we determine that a circuit court's decision is clearly erroneous (in the case of subjective bias), or an error of law (with respect to other alleged claims), we evaluate whether the error has affected the substantial rights of the party. This analysis is conducted in fact situations in which a defendant has *not* claimed a violation of his or her Sixth Amendment right to an impartial jury.

¶ 112. In *Martinez-Salazar*, the Court made the pointed observation that "we do not decide in this case

---

[17] *State v. Mendoza*, 227 Wis. 2d 838, 596 N.W.2d 736 (1999), utilized a harmless error analysis.

what the appropriate remedy for a substantial impairment [of the statutory right to peremptory strikes] would be." 528 U.S. at 317 n.4. This language provides guidance for future challenges.

¶ 113. The substantial rights of a party are not affected or impaired when a defendant chooses to exercise a single peremptory strike to correct a circuit court error. We are not called upon here to evaluate other situations. However, we note that in *Pool*, 94 Wis. at 453, this court commented on a New York case, *People v. Casey*, 96 N.Y. 115 (1884), saying that "if by the erroneous ruling [of the court], the party is obliged to exhaust all his peremptory challenges, the error is harmful."

¶ 114. In her *Ramos* concurrence, Chief Justice Shirley S. Abrahamson wrote that the *Ramos* majority concluded that automatic "reversal is the only feasible way to vindicate a party's right to peremptory challenges when the right is impinged by the court's erroneous denial of a challenge for cause." 211 Wis. 2d at 26 (Abrahamson, C.J., concurring). "The harmless error analysis. . .would fail to serve the purposes of the statutes."

¶ 115. Responding to these arguments in reverse order, we believe that giving a defendant unfettered exercise of peremptory challenges is not the sole purpose of the peremptory statutes. From the perspective of the defendant, there is always going to be some overlap between prospective jurors whom a defendant believes should be removed for cause and prospective jurors whom the defendant would simply prefer not to have on the jury. A defendant is not entitled to a favorable ruling on every challenge for cause, because some challenges lack merit. "A defendant is entitled to

a jury which will insure him [or her] a fair and impartial trial, but not to an unlimited choice in an attempt to secure a jury which will acquit him [or her]." *Pollack v. State*, 215 Wis. 200, 207–08, 253 N.W. 560 (1934), *overruled in part by State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965). Until *Ramos*, Wisconsin law had never required an automatic reversal when a defendant used a single peremptory challenge to cure a trial court error. *Traylor*, 170 Wis. 2d at 400.

¶ 116. In the absence of *Ramos*, there will be another dynamic at work vindicating a party's right to peremptory challenges. This dynamic is alluded to in *Martinez-Salazar*. Justice Ginsburg noted that "the immediate choice Martinez-Salazar confronted—to stand on his objection to the erroneous denial of the challenge for cause or to use a peremptory challenge to effect an instantaneous cure of the error—comports with the reality of the jury selection process." 528 U.S. at 316. "After objecting to the. . .denial of his for-cause challenge, Martinez-Salazar had the option of letting [the objectionable juror] sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal." *Id.* at 315. Justice Antonin Scalia took strong exception to these comments. "I would not find it easy to overturn a conviction where, to take an extreme example, a defendant had plenty of peremptories left but chose instead to allow to be placed upon the jury a person to whom he had registered an objection for cause, and whose presence be believed would nullify any conviction." *Id.* at 318–19 (Scalia, J., concurring).

¶ 117. The precise situation that Justice Ginsburg posed and Justice Scalia fears is already the law in Wisconsin. In *Gesch*, 167 Wis. 2d at 671, this court rejected the State's argument that the failure to exercise a peremptory challenge to a juror who was

challenged for cause but not excused results in a waiver of the defendant's right to raise the issue of whether the juror should have been struck for cause. The court declined to *require* that a defendant use a peremptory challenge to correct the error of the trial court. The *Gesch* decision contributed to the "win-win" situation for defendants that Justice Crooks described and criticized in his *Ramos* dissent.

■

¶ 118. Nothing in this opinion changes the fundamental law that an accused is entitled to be tried by an impartial jury. Our decision requires a defendant to make a conscious choice between exercising a peremptory challenge or waiting for a Sixth Amendment challenge after conviction. However, the State must now be more alert and sensitive to a defendant's challenge for cause. Anticipating the defendant's possible strategy, the State has three courses of action: (1) It can join the defendant in urging the court to remove a juror for cause; (2) it can exercise one of its own limited peremptory strikes to remove a juror who should have been struck for cause; or (3) it can do nothing and risk a new trial if an appellate court finds that a biased juror sat on the jury. We think the defendant's right to peremptory challenges will be effectively vindicated when prosecutors have an interest in seeing that jurors biased against the defendant never sit.

■

¶ 119. When the *Ramos* case was argued, the State conceded that situations might arise in which a defendant receives a fair and impartial jury but reversal is nevertheless appropriate. For example, reversal might be appropriate when a circuit court judge repeatedly and deliberately misapplies the law to force a defendant to use peremptory challenges or when the

court makes errors that force a defendant to use most or all of his or her peremptory strikes. The State made the same concession in oral argument in this case.

¶ 120. We conclude that the *Ramos* case should be overruled because our good intentions did not produce good results. The time has come to acknowledge error and move forward.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 121. The defendant also claims that he received ineffective assistance of counsel. He claims that counsel should have impeached Robert Hanson, who was a witness for the prosecution.

¶ 122. Hanson testified that while he was incarcerated in the La Crosse County jail Nathaniel Lindell told him about the burglary, homicide, and arson. He testified at Lindell's trial in exchange for the district attorney dismissing a charge of operating a vehicle without the owner's consent.

¶ 123. Nathaniel Lindell contends that Hanson told another inmate that it would be beneficial to tell the State that Nathaniel Lindell had confessed to the crimes at issue in this case. Lindell argues that Hanson should have been impeached with testimony from Richard Moeck, the inmate whom Hanson approached. Lindell points out that Hanson's was the only testimony containing inculpatory statements by Lindell, besides the inculpatory testimony of Joshua Lindell and Mitchell.

¶ 124. Defense counsel tried to impeach Hanson with information from Moeck while Hanson was on the witness stand before the jury. This information was learned by the defense during the course of trial. The State objected and argued that the defendant failed to

give notice of "other acts" evidence.[18] The circuit court sustained the objection but told defense counsel she could revisit the issue at a later time if she so desired. Defense counsel did not pursue a motion on this matter.

¶ 125. The United States Supreme Court articulated a two-part test for determining whether counsel's actions constitute ineffective assistance. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). A defendant must show "(1) that his counsel's representation was deficient and (2) that this deficiency prejudiced him so that there is a 'probability sufficient to undermine the confidence in the outcome' of the case." *Erickson,* 227 Wis. 2d at 768 (quoting *Strickland,* 466 U.S. at 694). In order to successfully claim ineffective assistance of counsel, a defendant must satisfy both prongs of the test. *Strickland,* 466 U.S. at 687. Wisconsin employs the *Strickland* test to evaluate ineffective assistance of counsel claims. *Erickson,* 227 Wis. 2d at 768; *State v. Pitsch,* 124 Wis. 2d 628, 633, 369 N.W.2d 711 (1985).

¶ 126. To satisfy the first prong of the *Strickland* test, the defendant must show that counsel's performance was deficient. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S at 689.

¶ 127. If the defendant can show deficient performance, he or she must also meet the second prong of the *Strickland* test by proving that this deficient per-

[18] Like the court of appeals, we do not analyze the circuit court's ruling on this matter because it is unnecessary to decide the defendant's claim of ineffective assistance of counsel.

formance prejudiced the defendant. *Id.* at 687. This entails showing "that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.*

¶ 128. When a reviewing court examines a claim of ineffective assistance of counsel, it is permissible to reverse the order of the two tests or avoid the deficient performance analysis altogether if the defendant has failed to show prejudice. *State v. Johnson*, 133 Wis. 2d 207, 222, 395 N.W.2d 176 (1986) (citing *Strickland*, 466 U.S. at 697). "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. . .that course should be followed." *Strickland*, 466 U.S. at 697.

¶ 129. We agree with the court of appeals and conclude that Nathaniel Lindell was not prejudiced by defense counsel's performance. As this is not an exercise in grading counsel's performance, we examine only the prejudice prong of the *Strickland* test.

¶ 130. We agree with the court of appeals in its three reasons for finding that the defendant was not prejudiced by Hanson. First, the circuit court found that defense counsel had made a strategic decision not to pursue the admission of this impeachment evidence against Hanson because the element of surprise had been eliminated. Second, Hanson's credibility was of limited value, as he had an extensive record. Third, the evidence of Nathaniel Lindell's guilt was overwhelming:

> For example, Todd Gass testified that he was approached by Lindell about participating with him in the burglary and using walkie-talkies before the

burglary occurred. Charles Schaub testified that Lindell purchased three communication radios from his store shortly before the burglary. Josh Lindell (the defendant's brother) and Marcus Mitchell testified that Mitchell agreed to serve as the lookout for the burglary while both Nathaniel and Josh Lindell went inside the Harmacek residence. Harmacek collected coins, and Lindell's roommate, Casey Castona, testified that after the date of the burglary Lindell had some rare coins that he was trying to sell.

*Lindell*, 238 Wis. 2d 422, ¶ 22. Accordingly, we conclude that Nathaniel Lindell was not prejudiced.

## VII. CONCLUSION

¶ 131. We conclude that the automatic reversal rule of *Ramos* is not the appropriate rule. Accordingly, the *Ramos* decision is overruled. The defendant in this case received that which he is entitled to under state law when he used a peremptory challenge to remove a prospective juror who should have been struck for cause. Finally, we conclude the defendant has not shown that he was prejudiced by any alleged ineffective assistance of counsel.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 132. ANN WALSH BRADLEY, J. *(concurring)*.

The circuit court is particularly well-positioned to make a determination of objective bias, and it has special competence in this area. It is intimately familiar with the voir dire proceeding, and is best situated to reflect upon the prospective juror's sub-

jective state of mind which is relevant as well to the determination of objective bias.

*State v. Faucher*, 227 Wis. 2d 700, 720, 596 N.W.2d 770 (1999).

¶ 133. I write separately because the majority opinion erases the deference that a reviewing court owes to a circuit court's objective bias determination expressed in the above quote. Like the court of appeals, I believe that the circuit court engaged in a thoughtful inquiry and reached a reasonable conclusion in determining that D.F. was not objectively biased.

¶ 134. Applying the correct standard and giving the circuit court's determination the weight it properly deserves, I conclude that a reasonable circuit court judge could conclude that D.F. was not objectively biased. Because I conclude that there was no error in failing to strike D.F. for cause, I need not reach the question of the *Ramos* remedy. However, because the majority has seen fit to overrule recent precedent without sufficient justification, I address this aspect of the majority opinion as well.

I

¶ 135. The preliminary question that the court must answer in this case is whether the circuit court erred in failing to strike D.F. for cause. The majority answers this question by stating that "[t]he totality of circumstances demonstrates that a reasonable person in D.F.'s position could not have remained fair and impartial." Majority op. at ¶ 41. While the juror's potential for fairness and impartiality must be measured against that of a reasonable person, the majority fails to engage in the inquiry that is ultimately controlling.

¶ 136. When reviewing a circuit court's objective bias determination, precedent requires that we ask whether the circuit court's conclusion is one that no reasonable judge could reach. In *State v. Faucher*, 227 Wis. 2d at 718–21, after explaining that the objective bias of a juror is to be determined under a reasonable person standard, we also concluded that weight must be afforded to the circuit court's objective bias determination. That weight derives from the circuit court's first-hand observation of the voir dire proceedings and its ability to reflect on the juror's subjective state of mind. *Id.* at 720. The weight attributed to the circuit court's determination tilts the scales in favor of affirmance to such a degree that we will not reverse the circuit court unless it reaches a conclusion that no reasonable judge could reach:

> We therefore give weight to the court's conclusion that a prospective juror is or is not objectively biased. We will reverse its conclusion only if as a matter of law a reasonable judge could not have reached such a conclusion.

*Id.* at 721; *State v. Kiernan*, 227 Wis. 2d 736, 745, 596 N.W.2d 760 (1999).

¶ 137. The standard announced in *Faucher*, and reiterated in *Kiernan*, is quite different from the standard applied by today's majority. Under the correct standard, we do not simply ask whether a reasonable person in the juror's shoes could remain impartial. Rather, we must ask whether no reasonable circuit court asking that question could have concluded that the juror was not objectively biased. The question is not whether we would have struck the juror for cause.

¶ 138. Applying the correct standard to the instant case, and giving the circuit court's determina-

tion the weight properly afforded to it, I conclude that the circuit court's decision that D.F. was not objectively biased must stand. The majority provides a litany of "bad facts" to support its independent conclusion that D.F. was objectively biased. However, it minimizes many of the considerations relied upon by the circuit court in making its determination that D.F. was not biased—a determination that is entitled to deference.

¶ 139. In making its initial ruling declining to strike D.F. for cause, the circuit court explained that it relied on D.F.'s repeated assertions that she was impartial and could fairly evaluate the evidence of the defendant's guilt. After witnessing and participating in both the general voir dire of the jury panel and the individual voir dire of D.F., the circuit court explained:

> [T]he fact of the matter is, [D.F.] has repeatedly assured you that her relationship with the deceased was minimal, that she can fairly and impartially try this case and that she can. . .be a good and fair juror.

D.F. assured the court that she had not drawn any conclusions regarding the defendant's guilt and had not had any discussions regarding who was responsible for the crime. Ultimately, D.F. explained that she was "very confident" in her ability to sit on the jury.

¶ 140. The goal of the jury selection process is to have a fair and impartial jury. In assessing the bias of jurors, an appellate court is left with only a written transcript to review, several months, often several years, after the actual jury selection. This reality limits our ability to fully assess the fairness and impartiality of an individual juror whom we have neither heard nor observed. The written transcript that we review is usually limited only to the spoken word. Yet a juror cannot

speak fairness or talk impartiality. Fairness and impartiality are communicated.

¶ 141. The essence of the weight afforded to the circuit court's determination are the unknown factors that do not survive transcription: tone of voice, demeanor, body language, and other intangibles. While we are not privy to these elements, there is more to the exchange between counsel, the circuit court, and D.F. than the majority relates in its opinion. Ultimately, there is more underlying the circuit court's determination that D.F. could be impartial and fair than the cold text of D.F.'s words.

¶ 142. These elements of the circuit court's decision were further explained by the circuit court when it denied Lindell's post-conviction motion seeking a new a trial based upon the failure to strike D.F. for cause. I believe that these excerpts reveal the deliberation of a reasonable circuit court concluding that it need not strike D.F. for cause:

> As to the issue of [D.F.], let's not talk about the questions that were asked of [D.F.] in a vacuum here. . . .
> . . . .
> . . . [T]o take this whole questioning and understand it, you have to take it in the context in which it occurred. . . .
> . . . .
> . . . [L]et's talk about what I saw and what I didn't see. . . .
> . . . .
> . . . I can emphatically say that there was absolutely nothing that was blocking my view of any of the jurors, including counsel, the podium, where they stood, how they stood, etc. I saw at a very close distance, maybe twenty feet, each and every juror

that was asked questions and the testimony that they gave. And I saw [D.F.].

. . .[I]n 25 years that I've been practicing law, and in the 14 years I've been on the bench, I've seen a lot of jurors, I've seen a lot of jurors asked a lot of questions. I've seen jurors who it's pretty clear are not giving truthful answers.

. . . .

It was clear from the very beginning that this was going to be an emotional case. We're talking about a very heinous crime and the death of a—death of a human being. This is not a disorderly conduct case, never was.

It was clear from the way all of the jurors reacted to the questioning that they took it as serious as everybody else did, [D.F.] included. I would not describe her as emotional. I would describe her as very honest, very sincere. I would describe her demeanor as somebody who is trying very, very hard to search her heart and her soul to answer as honestly and truthfullly as she could. Was she having some difficulty with that? Yes. Did she have to think about it? Yes. Were there pauses in her answers? Yes.

But in 14 years on the bench I don't think I've ever been more impressed with a juror who was trying to be as honest, sincere, and thorough as she possibly could. She was trying as hard as she possibly could to follow the instructions of the Court, to answer the questions as honestly and thoroughly as she could, and I think she did.

Now, what did she say? That she knew Miss Otto. She knew Mr. Harmacek but only through a business relationship. That she didn't have hardly any contact with Miss Otto. The only contact she had was with Mr. Harmacek when he delivered the beer to her parents' tavern. That she did not deal with him every day. That she never expressed an

758

opinion, and that she had no opinions about the guilt or innocence of Mr. Lindell. That she never had any discussions with Miss Otto about the case. And when she was asked — oh, that her parents had never offered any opinion about the guilt or innocence of Mr. Lindell.

So what you have is someone who had never socialized with either Miss Otto or Mr. Harmacek, never expressed an opinion of the guilt or innocence of the defendant, never discussed the guilt or innocence of the defendant with anyone else, that the only relationship she had with the two people was a business relationship, and who repeatedly time after time indicated that she could fairly and impartially decide this case, and that was an assertion that I believe and believe to this day.

And when she said, quote, "I think I can," the inflection on her voice was very emphatic, and I believe it was absolutely unequivocal. . . .I believe she was pretty emphatic that she could fairly and impartially try the case.

. . . .

. . . I do not believe that this [juror] was evasive in any way. I think she was honest, fair in her answers. It's clear from her demeanor that she searched her soul and answered fairly and that she could fairly and impartially decide this case. . . .

. . . Could a reasonable person under these circumstances be impartial? When you look at the cases that talk about juror impartiality, virtually all of them involve knowledge of a witness. They all involve somebody judging the credibility of a witness.

Miss Otto was a witness, although her testimony was extremely minor. If there was any feelings about Mr. Harmacek by [D.F.], unfortunately, Mr. Harmacek wasn't a witness here. This juror was not going to be asked to discuss the credi-

759

bility of Mr. Harmacek, was he telling the truth or not? She was not going to be asked. . .anything about him at all.

If this had been a case where there was a burglary, and Mr. Harmacek was testifying as a witness, as a victim, perhaps she would have been excused. But that wasn't the case here.

Is it reasonable for a person who has a relative who knows a victim to be able to put that aside and judge a case fairly and impartially when the victim's credibility, the victim's actions, are not in any way, shape, or form being judged or examined? Can we say that just because [D.F.] had a business relationship with the victim that she would want to convict somebody, anybody, even an innocent man? Because that's what the claim of bias boils down to, that somehow she would try to convict an innocent man based only on, on her minimal relationship with the victim.

I believe a reasonable person under these circumstances could fairly judge, impartially judge the case. I do not believe there was objective bias. There is a big difference between answers to questions that would result in a juror being struck for cause and answers to questions that would cause somebody to exercise a peremptory strike. And based on her answers, perhaps counsel wished to strike her and obviously did. But I do not believe. . .the evidence here justified my striking that juror.

¶ 143. If this thoughtful explanation is not that of a reasonable circuit court, I do not know what is. Would I have struck D.F. for cause? Maybe. But that is not the controlling inquiry. The controlling inquiry is whether a circuit court, exercising reasonable judgment, could decline to strike D.F. The circuit court in this case not only rested its bias determination upon relevant facts and considerations, but it carefully

explained its decision. I cannot conclude that the circuit court's determination was unreasonable.

¶ 144. Rather than give weight to the circuit court's determination, the majority eliminates the element of deference to be applied in an objective bias analysis. It parses D.F.'s words and draws its own conclusion that a reasonable juror in D.F.'s position could not remain fair and impartial.[1] The majority's approach is a departure from precedent, and it is a departure that I ultimately find to be determinative of the outcome of this case.

## II

¶ 145. I now briefly address the majority's decision to overrule *State v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997). I happen to be among those who believe *Ramos* was wrongly decided. I joined the dissent in *Ramos. See id.* at 30 (Crooks, J., dissenting). I later continued to dissent in *State v. Ferron*, 219 Wis. 2d 481, 508, 579 N.W.2d 654 (1998) (Bradley, J., dissenting). However, despite my disagreement, because of the many and consistent affirmations of *Ramos* by this court I eventually had to acknowledge it as valid precedent. *See, e.g., Kiernan*, 227 Wis. 2d at 751–52 (Bradley, J., concurring).

---

[1] Not only does the majority fail to give due weight to the circuit court's legal conclusions, but it also ignores the circuit court's factual observations and replaces them with its own. The circuit court explained that it did not recall D.F. "crying or even looking like she was ready to cry." Yet, the majority, relying on tenuous inferences, disregards this and imputes to D.F. an emotional state not founded in the record. By doing so, the majority negates the very reason we give deference to the circuit court. The circuit court is in the best position to determine whether there were tears or even a hint of sadness on the part of D.F.

¶ 146. Until today, *Ramos* remained valid precedent. Out of respect for the law and this court as an institution, I believe that the majority should continue to acknowledge it as precedent. Instead, with nothing changed but the bodies on this court, the majority overrules a case that, to my recollection, has been reaffirmed more than any other case in the last four years.

¶ 147. The court's decision in *State v. Ramos* was grounded in Wisconsin statutory law. *See, e.g.*, 211 Wis. 2d at 19 ("Wisconsin Statutes do not suggest that a defendant should be required to use a peremptory challenge against a juror who should have been removed for cause"). It was, after all, only Ramos's "statutory rights" that were deemed violated. *Id.* at 24–25. While the majority points to the decision in *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), and other factors in its decision to overrule *Ramos*, it points to no statutory change or anything indicating a shift in legislative intent to justify its reversal.

¶ 148. Our job, in statutory interpretation is to discern the intent of the legislature when it enacted the statute. Now four years later, a new majority apparently has a new interpretation of what the legislature meant when it enacted the statute. There has been no change in the relevant statutes, no change in the constitution, and no change in the underlying principles. Nonetheless, the majority substitutes its will over its obligation to stare decisis.

¶ 149. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. The court today overrules *State*

*v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997). I disagree with the court's overruling for three reasons:

(1) Today's majority opinion violates the rule of stare decisis, which requires a court to "stand by things decided." In other words, once this court has officially considered and settled a principle of law, this court must remain faithful to its precedent unless there are good reasons to overrule precedent. No such reasons exist to overrule *Ramos*. The *Ramos* court considered the authority and the rationale advanced by today's majority opinion and rejected them.

(2) Today's majority opinion violates a basic rule of statutory interpretation: Once this court has authoritatively construed a statute, the court maintains this construction unless and until the legislature either amends or repeals the statute. *Ramos* is based on this court's interpretation of Wis. Stat. § 972.03 (1995–96) governing peremptory strikes. The legislature has not changed this statute since the *Ramos* case, and the court should not change its interpretation of the statutes without new information.

(3) Today's overruling of *Ramos* leaves defendants with no satisfactory remedy for a circuit court's error in failing to strike a juror for cause.

## I

¶ 150. The simplest, easiest reason to dissent in the present case is to rely on the doctrine of stare decisis.[1]

---

[1] *See, e.g., State v. Stevens*, 181 Wis. 2d 410, 441–42, 511 N.W. 2d 591 (1994) (Abrahamson, J., concurring) ("Fidelity to precedent, the doctrine of stare decisis 'stand by things decided,' is fundamental to 'a society governed by the rule of law.' *Akron*

¶ 151. And stare decisis is an especially good reason in the present case because nothing new has been brought to the court's attention since *Ramos* that would justify a departure from precedent in *Ramos*.

¶ 152. Today's majority opinion focuses on the harmless error statute and nineteenth-century case law. The dissent in *Ramos* urged a harmless error analysis, and the *Ramos* court declined the invitation. Likewise, the *Ramos* dissent focused on nineteenth-century cases such as *Pool*,[2] *Bergman*,[3] and *Carthaus*,[4] which the *Ramos* court found unpersuasive.

¶ 153. Today's majority opinion has not added any new material for the court's consideration to justify overturning a 1997 decision of this court. To overturn a decision requires more than the majority opinion musters.

## II

¶ 154. The second reason to dissent in the present case is that *Ramos* is a statutory interpretation

---

*v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 420 (1983). When legal standards 'are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.' *Appeal of Concerned Corporators of Portsmouth Savings Bank*, 129 N.H. 183, 227, 525 A.2d 671 (1987) (Souter, J., dissenting, quoting *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 786–87 (1986), White, J., dissenting).").

[2] *Pool v. Milwaukee Mechanics Ins. Co.*, 94 Wis. 447, 69 N.W. 65 (1896).

[3] *Bergman v. Hendrickson*, 106 Wis. 434, 82 N.W. 304 (1900).

[4] *Carthaus v. State*, 78 Wis. 560, 47 N.W. 629 (1891).

case,[5] and the legislature has not changed the relevant statutes since *Ramos*. The general rule of statutory interpretation is that once this court has authoritatively construed a statute, the court maintains this construction "unless and until the legislature either amends or repeals the statute."[6]

¶ 155. Today's majority opinion ignores this basic rule of statutory interpretation when it concludes that the legislature could not have intended the authoritative construction that the *Ramos* court gave the peremptory challenge statute.[7] If the legislature does not overturn an interpretation of the statute, we assume the legislature agrees with our interpretation.[8] The legislature has not overturned our construction of

[5] A defendant's right to peremptory challenges is a creature of state law. State law, not federal law, determines the number of peremptory challenges, their purpose, and the manner of their exercise. The right to peremptory challenges is " 'denied or impaired' only if the defendant does not receive that which state law provides." *State v. Ramos*, 211 Wis. 2d 12, 19, 564 N.W.2d 328 (1997) (citing and quoting *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988)).

[6] *See State v. Anthony D.B.*, 2000 WI 94, ¶ 20, 237 Wis. 2d 1, 614 N.W.2d 435 ("Having authoritatively construed a statute, well-established principles of judicial decision-making require that the chosen construction be maintained unless and until the legislature either amends or repeals the statute.") (citing and quoting *Reiter v. Dyken*, 95 Wis. 2d 461, 470, 290 N.W.2d 510 (1980)).

[7] *See* majority op. at ¶ 82.

[8] *See also State v. Olson*, 175 Wis. 2d 628, 498 N.W.2d 661 (1993) ("Legislative silence with regard to new court-made decisions indicates legislative acquiescence in those decisions.") (citing *In Interest of R.W.S.*, 162 Wis. 2d 862, 880, 471 N.W.2d 16 (1991); *State v. Eichman*, 155 Wis. 2d 552, 566, 455 N.W.2d 143 (1990)).

the statutes in *Ramos*. Legislative silence on this question is far more revealing than today's revisiting of nineteenth-century case law and the harmless error rule.

¶ 156. The *Ramos* decision rests on an interpretation of Wis. Stat. § 972.03 (1995–96), which provides that "the defendant is entitled to 6 peremptory challenges. . . . Each side shall be allowed one additional peremptory challenge if additional jurors are to be impaneled under s. 972.04(1)."[9]

¶ 157. Today's majority opinion ignores these jury statutes directly at issue in the present case and in *Ramos* and instead turns the reader's attention to the harmless error rule.

¶ 158. Justice Donald Steinmetz, writing for the court in *Ramos*, focused on the defendant's substantive right to a full complement of peremptory challenges guaranteed by Wis. Stat. § 972.03. The *Ramos* decision refused to apply the harmless error rule as a matter of statutory interpretation. Justice Steinmetz's concluding words in the *Ramos* opinion are as follows:

> Although it is a shame to have a new trial in this tragic first-degree murder case when a fair and impartial jury made the final decision, the error by the trial court requires that the defendant receive a new trial. We hold that the use of a peremptory challenge to correct a trial court error is adequate

---

[9] The *Ramos* court expressly embraced the statutory claim. *Ramos*, 211 Wis. 2d at 21. The *Ramos* court concluded that under the Wisconsin statutes the defendant was entitled to a set number of peremptory challenges. It further concluded that defendant Ramos was deprived of the statutory right to exercise a full complement of his peremptory challenges when he used a challenge to remove a juror whom the circuit court should have excused for cause.

grounds for reversal because it arbitrarily deprives the defendant of a *statutorily granted right*.[10]

¶ 159. I joined *Ramos*, but that fact is irrelevant for purposes of this discussion. What is relevant is whether I have learned anything new to justify reconsideration of our statutory interpretation in *Ramos*. The answer to that question is no.

¶ 160. The majority opinion criticizes the *Ramos* court for reading too much into *Ross v. Oklahoma*[11] and not anticipating the holding of *United States v. Martinez-Salazar*.[12] But in *Ross*, the U.S. Supreme Court endorsed our *Ramos* interpretation of the Wisconsin statutes.[13] Moreover, there was no need for this court to anticipate *Martinez-Salazar*: that decision is based purely on an interpretation of the federal rules of criminal procedure and has no bearing on how state courts interpret their peremptory challenge statutes.[14]

## III

¶ 161. The third reason to dissent in the present case is that the *Ramos* automatic reversal rule maintains a level playing field for both the State and the defendant. As a result of *Ramos*, each party is guaranteed a full complement of peremptory strikes, and the

---

[10] *Ramos*, 211 Wis. 2d at 24–25 (emphasis added).

[11] 487 U.S. 81 (1988).

[12] 528 U.S. 304 (2000); *see* majority op. at ¶¶ 53, 83.

[13] *See Ross v. Oklahoma*, 487 U.S. at 89 ("Because peremptory challenges are a creature of statute and are not required by the [federal] Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise. As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides.").

[14] *See* majority op. at ¶ 91.

parties are not forced to take over the circuit court's role of removing jurors for cause.

¶ 162. With *Ramos* overruled, few if any practical remedies are available to a defendant, other than to "lose" a peremptory challenge when the circuit court errs in allowing a biased juror to sit. Three alternative courses of action have been suggested, none of which provides a firm foundation for ensuring both a defendant's right to an unbiased jury and a defendant's right to a statutorily guaranteed complement of peremptory challenges.

¶ 163. First, a defendant could allow a juror who should have been removed by the circuit court for cause to serve and then claim an unfair trial. In *State v. Gesch*,[15] this court held that a defendant does not waive the right to challenge a conviction on the ground of an unfair trial if the defendant does not use a peremptory challenge to remove a juror whom the circuit court should have removed for cause. Although today's majority opinion relies on our holding in *Gesch*, some readers might, in the light of today's *Ramos* reversal, view *Gesch* as perched on a banana peel.

¶ 164. In his concurring opinion in *Martinez-Salazar*, Justice Antonin Scalia explains the practical problems a court faces in abiding by the *Gesch* rule. Justice Scalia wrote:

> The difficult question, however, is. . .whether normal principles of waiver. . .disable a defendant from objecting on appeal to the seating of a juror he was entirely able to prevent. I would not find it easy to overturn a conviction where, to take an extreme example, a defendant had plenty of peremptories left but chose instead to allow to be placed upon the

---

[15] *State v. Gesch*, 167 Wis. 2d 660, 482 N.W.2d 99 (1992).

jury a person to whom he had registered an objection for cause, and whose presence he believed would nullify any conviction.[16]

¶ 165. Counsel for the defendant in the present case suggests that as a practical matter defense counsel would be reluctant to rely on *Gesch*:

> Certainly *Gesch* is still the law in Wisconsin. However, it is hard to imagine sitting next to a client at defense table during voir dire and informing him that you cannot use a peremptory on a certain juror who just minutes earlier you were seeking to remove for cause in hopes that *Gesch* would not be overturned on waiver grounds.

¶ 166. A *Gesch*-based approach seems to raise legal and practical problems, limiting its usefulness in most cases.[17]

¶ 167. Second, a defendant could try to show that the circuit court deliberately misapplied the law and the circuit court's purpose in misapplying the law was to force the defendant to use a peremptory challenge to correct the court's error.[18] I view it as highly unlikely that a Wisconsin circuit court judge would act in this manner.

¶ 168. Third, a defendant who has used a peremptory challenge to cure an erroneous denial of a challenge for cause and who has exhausted his statutory peremptory challenges could request a "make-up" peremptory challenge or could raise an objection to a sitting juror who would have been struck if the defendant had any remaining statutory challenges. The

---

[16] *United States v. Martinez-Salazar*, 528 U.S. 304, 318–19 (2000) (Scalia, J., concurring).

[17] *See* majority op. at ¶¶ 116–18.

[18] *See Martinez-Salazar*, 528 U.S. at 316 (2000).

circuit court's denial of his request or objection would raise an issue not presented in this case.[19] As the State points out, the defendant in the present case did not request additional peremptory challenges or object to any juror who sat. Of course the defendant did not. There was no need to do so. The defendant in the present case was relying on, and was justified in relying on, our *Ramos* rule of automatic reversal. The majority concludes, however, that the defendant cannot get the benefit of his reliance on the *Ramos* case.

## IV

¶ 169. In summary, I am sorry to see *Ramos* overturned. Sorry not because *Ramos* was, in my opinion, a correct decision, but more importantly because overturning *Ramos* undermines confidence in the reliability of our decisions.

¶ 170. For the reasons stated, I dissent.

---

[19] *See also Martinez-Salazar*, 528 U.S. at 317–18 (2000) (Souter, J., concurring). Justice Souter wrote:

> I concur in the opinion of the Court. I write only to suggest that this case does not present the issue whether it is reversible error to refuse to afford a defendant a peremptory challenge beyond the maximum otherwise allowed, when he has used a peremptory challenge to cure an erroneous denial of a challenge for cause and when he shows that he would otherwise use his full complement of peremptory challenges for the noncurative purposes that are the focus of the peremptory right. Martinez-Salazar did not show that, if he had not used his peremptory challenge curatively, he would have used it peremptorily against another juror. He did not ask for a make-up peremptory or object to any juror who sat. Martinez-Salazar simply made a choice to use his peremptory challenge curatively.

¶ 171. I am authorized to state that Justice WIL-LIAM A. BABLITCH joins this opinion.